UNITED STATES of America

v.

Donald Thomas MARGRAF, Appellant.

No. 72–1331.

United States Court of Appeals,
Third Circuit.

Argued Oct. 5, 1972.

Submitted for Reconsideration En Banc
Jan. 3, 1973.

Decided June 20, 1973.

Judgment Vacated Dec. 17, 1973.
See 94 S.Ct. 833.

Bernard L. Segal, Brian E. Appel, Segal, Appel & Natali, Philadelphia, Pa., for appellant.

Carl J. Melone, U. S. Atty., Philadelphia, Pa., John T. Thorn, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Argued Oct. 5, 1972.]

Before SEITZ, Chief Judge, FORMAN and HUNTER, Circuit Judges.

Submitted for Reconsideration En Banc Jan. 3, 1973.

Present SEITZ, Chief Judge, and FORMAN, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

Appellant Donald Thomas Margraf appeals his conviction for attempting to carry a "concealed deadly or dangerous weapon" aboard a commercial aircraft in violation of 49 U.S.C. § 1472(*l*) (1971). After waiving trial before the district court, he was tried before a magistrate pursuant to 18 U.S.C. § 3401 (1971), found guilty, and fined $100. He appealed his conviction to the district court pursuant to 18 U.S.C. § 3402 (1971), which affirmed, 347 F.Supp. 230. This court's jurisdiction is predicated upon 28 U.S.C. § 1291.

█ Appellant was arrested at Philadelphia International Airport while attempting to board a flight to San Francisco, California. Airline employees had notified the Customs Security Officer at the boarding gate that appellant conformed to the "Hijacker Profile." Consequently, as appellant passed through the magnetometer, a metal detection device placed at the gate, his reading on the meter was checked. Because it indicated the possible presence of a weapon on appellant, he was asked to step

through the magnetometer again. A second positive reading resulted. The officer then detained appellant. The officer testified that he asked appellant if he were carrying "a knife, a weapon, or any other large metallic object."[1]

After appellant responded negatively to the officer's inquiry, he was searched and a folding pocketknife seven and one-half inches in overall length with a three and one-quarter inch blade was discovered in his right front pocket.

The magistrate held that appellant had violated 49 U.S.C. § 1472(*l*):

[W]hoever, while aboard an aircraft being operated by an air carier in air transportation, has on or about his person a concealed deadly or dangerous weapon, or whoever attempts to board such an aircraft while having on or about his person a concealed deadly or dangerous weapon, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Appellant challenges this conviction on two grounds. He claims that it is necessary for the government to prove a specific intent to carry a "concealed deadly or dangerous weapon" onto a plane in order for a defendant to be convicted. In other words, it is not sufficient for the government to show that a defendant was boarding a plane with a concealed deadly weapon on his person; it must go further and show that the defendant was aware that his weapon was dangerous, and knowing this, still intended to carry the weapon aboard. Appellant's second contention is that the pocketknife he was carrying could not be considered a "deadly or dangerous weapon."

## SPECIFIC INTENT

Congress added paragraphs (i) through (m) to § 1472 in 1961 in an attempt to combat airplane hijacking.

---

1. Appellant claims he was asked only if he were carrying any large metal objects. Although the magistrate did not make any specific finding on this point, on appeal the evidence and the inferences to be drawn from it must be taken in the light most favorable to the government. *E. g.*, United States v. Goberman, 458 F.2d 226 (3d Cir. 1972). We must, as did the district court, credit the testimony of the officer.

"The primary purpose of this legislation is to amend the Federal Aviation Act of 1958 so as to extend Federal criminal laws to certain acts committed on board aircraft—in particular, such acts as aircraft 'hijacking', murder, manslaughter, assault, maiming, carrying concealed deadly or dangerous weapons, and stealing personal property. . . .

"Recent events have demonstrated the urgent need for stronger Federal laws applicable to criminal acts committed aboard commercial and private aircraft.

"The provisions of this legislation, it will be noted, are based on the use of criminal sanctions as a deterrent to the commission of criminal acts.
. . .

"Broad, stringent legislation such as is proposed here, cannot, of course, prevent piracy of aircraft, but it is to be hoped that the enactment of laws providing stiff penalties for various crimes in air commerce will deter all except the hopelessly unbalanced from risking life and liberty in such undertakings." H.R.Rep.No.958, 87th Cong., 1st Sess. (1961), 1961 U.S., U.S.Code Cong. & Admin.News 2563.

■ Although as written § 1472(*l*) does not contain a specific intent requirement, appellant would have us read one into the statute. This we decline to do.

In Holdridge v. United States, 282 F. 2d 302, 310 (8th Cir. 1960), Justice (then Circuit Judge) Blackmun listed the factors to consider in whether a statute could be construed as not requiring a specific intent:

" . . . where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting."

The presence of these factors here plus the strong contrast between paragraph (*l*) and 49 U.S.C. § 1472(m) compel us to hold that paragraph (*l*) does not contain a specific intent requirement. Paragraph (m) was passed by Congress at the same time as paragraph (*l*). The fact that paragraph (m) contains an express intent requirement is particularly convincing evidence that Congress did not intend such a requirement for paragraph (*l*). That the maximum penalties for violating paragraph (*l*) are much less than those for violating paragraphs (i) and (j) is also an indication that no specific intent is necessary for a violation of paragraph (*l*).[2]

A person who boards a plane with a concealed deadly weapon need not intend to use it to be a hazard. The mere presence of a weapon on board a plane creates a hazard because it may be seized and used by a potential hijacker.

In view of the seriousness of the hijacking problem—both at the time of enactment and at the present[3]—it is rea-

2. 49 U.S.C. § 1472(i) imposes a minimum sentence of twenty years for air piracy. 49 U.S.C. § 1472(j) permits a maximum sentence of twenty years and a fine of $10,000 for interfering while on board an airplane with a flight crew member. If a deadly or dangerous weapon is used, life imprisonment may be imposed.

3. As the Fifth Circuit recently stated in United States v. Moreno, 475 F.2d 44 at p. 48 (5th Cir., 1973):
" . . . Although the crime of air piracy exceeds all others in terms of the potential for great and immediate harm to others, its undesirable consequences are not limited to that fact. Among other things, it has been used as an avenue of escape for criminals, a means of extorting huge sums of money and as a device for carrying out numerous acts of political violence and terrorism. Perhaps most disturbing of all is the fact that aerial hijacking appears to be escalating in frequency. We do not think that it is unrealistic to say that the current situation has approached the crisis stage for law enforcement officials in this country."

sonable to conclude that Congress meant paragraph (*l*) not to have a specific intent requirement. To include a specific intent requirement would be judicial legislation, and such inclusion could seriously hinder attempts at enforcing this statute.

The dissent contends that this case is governed by United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). In particular, it finds Justice Brennan's concurrence in that case persuasive. *Freed* does not control this case. For each particular statute which we consider, we have to make a determination as to what Congress intended. As Justice Brennan pointed out, in *Freed* the court was considering amendments to a pre-existing statute. Cases decided under the pre-existing statute had held that a specific intent requirement was necessary to convict. The Court decided that Congress approved these cases in amending the statute. We have no similar case history before us here. Nor do we have any other indication that specific intent is necessary.

### "DEADLY OR DANGEROUS WEAPON"

If, therefore, the pocketknife in this case can be described as a "concealed deadly or dangerous weapon," it will be necessary to uphold appellant's conviction.

The House Report accompanying paragraph (*l*) stated:

"Consideration was given to attempting to define the term 'deadly or dangerous weapon'. However, this is not practicable. These terms have been used without definition in other provisions of Title 18, United States Code, and in many State Criminal laws.

The courts will determine in each case, as it arises, whether the weapon in question was deadly or dangerous." H.R.Rep. No. 958, 87th Cong., 1st Sess. (1961), 1961 U.S.Code Cong. and Admin.News 2563, 2570.[4]

This case-by-case determination in turn depends on the entire context of the situation being considered.

"[W]hat in one context might not be a dangerous weapon in a· different context would be a dangerous weapon, giving consideration to the language and purpose of the specific statute involved, the nature, use or anticipated use of the 'weapon' involved and the consequences logically flowing from its use. See United States v. Barber, D.C.Del.1969, 297 F.Supp. 917, 922, 923, and cases cited therein; Baker v. United States, 5 Cir. 1969, 412 F.2d 1069; United States v. Brown, 9 Cir. 1969, 413 F.2d 878". United States v. Ware, 315 F.Supp. 1333 (W.D.Okla. 1970).

Appellant contends that since his knife was found in a logical place, his pocket, and since there was no indication that he intended to use the knife in a threatening way, the finding of the magistrate that this was a deadly weapon cannot be upheld.

[3] There are several factors present here which in view of the congressional intention to prevent potential weapons from being carried aboard planes lead us to uphold the determinations of the magistrate and of the district court that the knife in question was a "concealed deadly or dangerous weapon."

First, the knife (open) was seven and one-half inches long, including blade and handle and its blade was three and one-quarter inches long.[5] It was certainly

---

4. As the dissent points out, this statement was made concerning paragraph (j) of the Act. But it was also specifically made applicable to paragraph (*l*). H.R. Rep.No.958, 87th Cong., 1st Sess. (1961), 1961 U.S.Code Cong. and Admin.News 2563, 2575.

5. While we do not adopt the following definition, it may be relevant to note

how Congress defined the term "dangerous weapon" in prohibiting people from carrying one onto the grounds of the United States Capitol:

"The term 'dangerous weapon' includes all articles enumerated in section 14(a) of the Act of July 8, 1932 (47 Stat. 654, as amended: D.C.Code 22–3214(a) and also any device designed

capable of being used as a weapon. Second, in a boarding situation it must be emphasized that administrative agents and courts have to act prospectively. They do not have the advantage of hindsight to see if a person with a knife used it in any threatening manner. Nor can one reasonably expect a hijacker to announce his plan so early. To adhere to appellant's argument would give many prospective hijackers a free try at evading airport security measures.[6] The dissent's solution—to rewrite the statute to allow weapon carriers to go free but to permit the seizure of the weapons—would provide no deterrent to any prospective hijacker.

Third, there were signs at the airport warning people that to board a plane with a deadly weapon is a crime. And fourth, when appellant's knife triggered the magnetometer, he was asked by the officer present if he was carrying any knife, weapon, or other large metallic object, to which he responded "no." While appellant may have considered his knife a tool and not a knife or deadly weapon, he still should have been aware that it could be used as a deadly weapon and that others could have classified it as a deadly weapon.

We do not intend, as the dissent would indicate to do, that the above statement will be used as a test of culpability. We are concerned about a situation in which a person carrying what anyone in the country would classify as a knife responds "no" to a question in which he was asked if he were carrying a knife.

Appellant's answer was a circumstance which the fact finder could consider in determining whether the pocketknife was a deadly or dangerous weapon *in this case*. He did not have to credit the appellant's contention that his knife was not a knife but a tool. This case involves more than a simple "walk-on" attempt that was stopped at the magnetometer. If the appellant had attempted to stab someone with the knife, there would have been no problem in considering it a deadly or dangerous weapon. But it is entirely unrealistic to think that any hijacker would commit himself this early or in this overt a fashion.

It is more difficult to determine prospectively whether a deadly or dangerous weapon is involved than it is to make that determination retrospectively. In contrasting the penalties in paragraphs (j) and (l), Congress provided for these difficulties. We would not think that knitting needles, etc., would normally be classified as deadly or dangerous, but there certainly could be situations in which they would be so classified.

Appellant also conjures up the specter of troops of boy scouts being hauled to jail as a result of this decision. We do not think that this will occur. As in the sentencing in this case, courts will have to balance the potential harm to innocent passengers with what could be an unknowing act by a defendant. This is precisely the kind of judicial determination that Congress envisioned in passing § 1472(l).

---

to expel or hurl a projectile capable of causing injury to persons or property, daggers, dirks, stillettoes, and knives having blades *over three inches* in length." (Emphasis added). 40 U.S. C. § 193m(a)(3).

6. The Fifth Circuit has recognized these difficulties in a different context:

"  .  .  . Obviously, in order to jeopardize the lives and safety of the smallest number of people, the hijacker must be discovered when he is least dangerous to others and when he least expects confrontation with the police. In practical terms, this means while he is still on the ground and before he has taken any overt action.

"Clearly, this would not be an easy objective to accomplish under the best of conditions. But amidst the rush and the congestion of many airports, this task is vastly complicated. Airport security officials have the awesome responsibility of ferreting out hijacking threats from among thousands of passengers while at the same time avoiding any undue disruption to this nation's heavy flow of commercial air traffic. .  .  . " United States v. Moreno, 475 F.2d 44, 49 (5th Cir., 1973).

The dissent also argues that if a specific intent requirement is not read into paragraph (*l*), it is unconstitutional because it is overbroad or because it permits too much discretion in law enforcement officers. This contention was argued by the appellant before the magistrate, but not before the district court nor before us on appeal. We therefore do not find it necessary to decide it.[7]

The judgment of the district court will be affirmed.

SEITZ, Chief Judge (dissenting).

After an examination of the statute and recent Supreme Court precedent, I am forced to conclude that the majority is in error. I believe that in order to prove its case under the statute, the Government at the minimum must prove three elements: (1) that defendant was carrying a "concealed deadly or dangerous weapon"; (2) that defendant knew what he was carrying was a "concealed deadly or dangerous weapon"; and (3) that defendant attempted to board, or did board, a commercial aircraft carrying that "concealed deadly or dangerous weapon." Even assuming *arguendo* the Magistrate's findings on Points (1) and (3) can be sustained, there is no basis on which Point (2) can even be arguably sustained. Not only did the Government adduce no evidence on point, but the Magistrate, like the majority, concluded that no intent or knowledge of any kind need be proven. In this, I think, lies their error. I believe the majority's construction of the statute and the resultant validation of defendant's conviction not only fails to comport with standards mandated by both this court and the Supreme Court, but in so doing, denies the defendant the due process of law guaranteed him under the Fifth Amendment.

However, it is imperative to emphasize at the outset what is not the result of my conclusion. The effect of my position is not to deny law enforcement officials all opportunity to search individuals boarding planes; neither is it to stop them from seizing certain objects which they might consider potentially dangerous if carried aboard the plane. The thrust of my position is that without adequate warning, which is not shown here, criminal liability cannot attach.

## I. THE REQUIREMENT OF KNOWING POSSESSION OF A "DEADLY OR DANGEROUS WEAPON."

In 1961, Congress added §§ (i)–(n) to § 1472 by an act known as the Anti-Hijacking Statute. 49 U.S.C. §§ 1472(i)–(n) (1971). Subsections (i)–(m) added substantive offenses; § (n) merely authorized the Federal Bureau of Investigation to investigate criminal conduct within the scope of the section. Of the offenses added, § (m) has an express intent requirement, while §§ (i)–(k) subsume an intent requirement by making

---

7. But the language of the Supreme Court in United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947), could well be applicable:

    "We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."

There are, it seems, two problems raised by the dissent. The first is whether the wording "deadly or dangerous" is overbroad. To this the above language may be applicable. The second is whether given that "deadly or dangerous" is capable of constitutional definition, are law enforcement officials unconstitutionally discriminating in their decisions as to whom to prosecute under the statute.

Our legal system relies to a large extent on the discretion of law enforcement officers and judges. There has been no allegation of discriminatory enforcement in this case. Nor do the figures cited by the dissent give us a sound basis for finding that to be the practice under this statute.

**714**

criminal certain overt acts. Only § (*l*), with which we are here concerned, is indefinite both on its face and by its terms as to whether it incorporates any intent requirement.

Subsection (*l*), in proscribing any "concealed deadly or dangerous weapon" aboard commercial aircraft, is among those statutes which the Supreme Court has classified as regulatory. Two recent Supreme Court cases give definition to the Government's burden of proof under such statutes.

The first of these cases was United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). There, the defendants had been charged with possession of unregistered firearms by reason of their possession of unregistered hand grenades, in violation of 26 U.S.C. § 5812 et seq. (1971). As with 49 U.S. C. § 1472(*l*), the statute contains no express intent requirement on its face nor implies such a requirement by its terms. However, unlike § 1472(*l*), definition has been given as to what constitutes a "firearm" within the proscription of the statute; a hand grenade is expressly defined as a "firearm." 26 U.S.C. §§ 5845(a) and (f) (1972). In discussing the majority opinion, the concurring opinion stated:

> To convict appellees of possession of unregistered hand grenades, the Government must prove three material elements: (1) that appellees possessed certain items; (2) that the items possessed were hand grenades; and (3) that the hand grenades were not registered. The Government and the Court agree that the prosecutor must prove knowing possession of the item and also knowledge that the items possessed were hand grenades.

401 U.S. at 612, 91 S.Ct. at 1119.[1]

The second case relevant to our discussion followed the *Freed* decision and shows that in fact the concurring opinion in its discussion of the requirements under the statute as to "knowing possession"—from which intent may be legally inferred—accurately reflected the views of the *Freed* majority. United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L. Ed.2d 178 (1971). In this case, the statute contained a provision requiring a "knowing" violation. However, the Court found no difficulty in equating the Government's burden of proof therein with that discussed by the concurring opinion in *Freed* even though the statute in the latter case did not contain such a requirement. The Court stated:

> Here, as in United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed. 2d 356 (1971), which dealt with the possession of hand grenades, strict or absolute liability is not imposed; knowledge of the shipment of dangerous materials is required.

402 U.S. at 560, 91 S.Ct. at 1698.

Yet even in the case of the Supreme Court's mandate, and even in the face of the similarity of § 1472(*l*) to the statute in *Freed* as to the lack of an express or implied intent requirement, the majority contends that implying just such a requirement in § 1472(*l*) would be judicial legislation. In fact, in so holding, what they have imposed is an absolute liability which the Supreme Court has said was not imposed under the similar statute involved in *Freed*. I believe this to be the majority's first error of law. In my opinion it is incumbent upon the Government to prove that defendant knowingly possessed what he knew to be a "concealed deadly or dangerous weapon."

---

1. The majority in *Freed* stated: "This is a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.* at 609, 91 S.Ct. at 1116. However, while one might not be surprised to find that carrying a hand grenade is not an innocent act, I think most would be surprised to find out that attempting to board a plane carrying a pocketknife which otherwise complies with all applicable laws is not an innocent act. In this regard, see Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

## II. THE PER SE STANDARD.

Generally in statutes proscribing the carrying of a "deadly-" or "dangerous weapon," a presumption of intent attaches under the statute merely by the fact of possession of certain specified objects. Some of these proscriptions have been aimed against particular types of knives. Pennsylvania, the state of defendant's attempted departure, proscribes by statute any dirk, any dagger, and any automatic or spring operated knife. Pa.Stat.Annot., title 18, § 4416 (Purdon Supp.1972). A Philadelphia ordinance has added a proscription against knives with blades longer than four inches (defendant's manual folding pocketknife had a blade of three and one-quarter inches). California, the defendant's destination, proscribes any dirk, any dagger, any automatic or spring operated knife, and any knife with a blade longer than five inches. Cal.Penal Code § 3024(f). Thus, defendant's knife was not proscribed by law either in the state of departure or at his destination.

Where weapons are specifically proscribed under a "deadly-" or "dangerous weapon" statute, they are considered deadly or dangerous per se—e.g., as a matter of law. In such instances, the mere possession—or the mere possession concealed or unregistered, depending upon the statute—is sufficient to infer the requisite intent or knowledge.

Again, the opinion and statute in *Freed* are illustrative. There, a hand grenade was expressly defined as a firearm within the proscription of the statute. Therefore, in order for the Government to show the defendants knowingly possessed a proscribed "firearm," it would have to introduce evidence showing the defendants knew the objects they possessed in fact were hand grenades. Once this offer of proof had been made, the Government could rely upon the statutory definition of a hand grenade as a "firearm" in drawing a legal inference as to the knowing possession of a "firearm." This proof of "knowing" possession was deemed to be required for conviction despite the absence of such a requirement on the face of the statute. Thus, the Supreme Court could say that strict liability was not imposed under the statute.[2]

Even a casual perusal of § 1472(*l*) reveals that the Government did not have the same degree of specificity favoring it here as it did in *Freed*. Because of the broad language of the statute and the intricacies of the competing state and federal jurisdictions in an airport, I will assume that the statute was intended to incorporate any applicable state statute or city ordinance of the place where the airport is situated.[3] Thus, except for those items specifically proscribed by Philadelphia and Pennsylvania, there is no "knowledge" presumption attaching to the possession and conceal-

---

**2.** The concurring opinion in *Freed* relied upon two cases for the proposition that Congress implicitly approved an intent requirement in its revisions of the statute there under review. Sipes v. United States, 321 F.2d 174 (8th Cir. 1963); United States v. Decker, 292 F.2d 89 (6th Cir. 1961). In both, the Government proved the defendant knowingly possessed an object, that the object was specifically defined under the statute, and that the defendants knew the object to be that specifically defined item. Because of this statutory specificity, the Government was able to rely upon the statutory definition to prove defendants' knowing possession of a firearm. The majority in *Sipes* also noted that a sawed-off rifle, the

weapon there involved, is useless for any lawful purpose.

I note that it was only because of this specificity that the majority in each case found it unnecessary to consider the Fifth Amendment due process issue.

**3.** I make this assumption only for the purposes of this dissent in order to give the Government every benefit that could arguably support its position. I would note that no such intent to incorporate concurrent state provisions appears in the statute or the legislative history. If in fact the Government cannot avail itself of the presumptions under the applicable state law, the problems outlined in this dissent are only further exacerbated.

ment of any object from which to infer legal intent under the federal statute merely by the fact of such possession and concealment. Within these parameters, defendant's pocketknife was not proscribed per se under any applicable state or federal statute.

Because defendant's knife was not proscribed per se under any applicable law, the Government's burden under *Freed* becomes extremely difficult to sustain. As there are no specific statutory proscriptions, the Government cannot merely prove the defendant carried a specifically proscribed object which he knew to be that object. Instead, the Government must prove the defendant knew the knife he carried was a deadly or dangerous weapon. Complicating the Government's task in this regard is the fact that a pocketknife, unlike a gun, has been recognized not to be an intrinsically deadly or dangerous weapon in the absence of a specific statutory proscription. Fall v. Esso Standard Oil Corp., 297 F.2d 411 (5th Cir. 1961), cert. denied, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55 (1962).

Since the defendant cannot be imputed with knowledge that he was carrying a "concealed deadly or dangerous weapon" merely because he was carrying a pocketknife, the Government, in the absence of a statutory definition, must prove by other elements that the defendant knew he was carrying a "concealed deadly or dangerous weapon" when he attempted to board his flight.

## III. THE SURROUNDING CIRCUMSTANCES TEST.

Where the Government cannot prove its case merely by relying upon a specific statutory proscription, subjective intent to do the proscribed act may be inferred from an examination of the surrounding circumstances. The Government introduced no evidence on this point nor even apparently assumed such

evidence was necessary. Rather, the only evidence introduced by the Government was the pocketknife itself and the testimony of the agent who seized it. The agent testified he stopped defendant and asked him if "he had in his possession a knife, weapon, or other large metallic object." Even the disjunctive phrasing of the question fails to equate a knife with a weapon. The agent also testified that defendant had been singled out by airline employees as fitting certain characteristics of the Hijacker Profile. Against this, defendant testified he was in a musical group and he both considered and used his knife as a tool in working with band equipment. The Government offered no rebuttal.

On this record, the Magistrate first examined other cases. He found that rakes, wine bottles, chair legs, and shoes had been held to be dangerous weapons because of the manner in which they were used. Because of this, he held that a pocketknife was within the "realm of a weapon." Next, he concluded the statute was within the "peculiar legislative area of crime known as *mala prohibita*." Based on these findings,[4] he concluded this knife was within the ambit of the statute and defendant could be convicted under its provisions whether or not he had any intent.

Thus, although the Magistrate possibly *could* have considered defendant's denial of his pocketknife probative, the record shows he did not. Rather, he considered no evidence other than the uncontested fact of defendant's possession of the pocketknife concealed in his front pants pocket while attempting to board a commercial airplane. He then concluded, as does the majority here, that no intent is required under the statute for conviction. However, in reaching his conclusion that this object, not intrinsically deadly or dangerous, could be considered deadly or dangerous for purposes of this subsection, the

4. Where a defendant waives his right to trial before the district court and consents to trial before a magistrate under 18 U.S.C. § 3401 (1971), the magistrate is the only fact finder.

Magistrate relied upon cases where the objects were classified deadly or dangerous only because of the manner in which they had actually been used.

The majority's failure to comprehend the Government's burden of proof under *Freed* is manifested by the statement in the majority opinion that "[w]hile appellant may have considered his knife a tool and not a deadly weapon, he still should have been aware that it could be used as a deadly weapon and that others could have classified it as a deadly weapon." However, it is not whether other people might consider it to be, or could use it as, a deadly weapon; under *Freed*, the Government must prove the *defendant* knew it to be a deadly weapon. This burden becomes even heavier if carrying a pocketknife otherwise complying with all applicable laws is considered innocent conduct. Not only would the Government have to prove defendant's knowledge of the nature of the object he carried, it would have to prove his knowledge of the law he was allegedly violating. *Cf.* Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). In misapprehending the burden of proof thrust upon the Government, I believe the majority has made its second error of law.

## IV. THE CONGRESSIONAL HISTORY

The majority predicates its conclusion that no intent or knowledge is required under § 1472(*l*) upon its reading of the congressional history. However, in so doing, it fails to distinguish between the differing burdens of proof thrust upon the prosecution under two separate types of "deadly-" or "dangerous weapon" statute's. These two types of statutes are: (1) the type which punishes any attack or attempted attack with a "deadly or dangerous weapon"—a "hind-

sight" statute; and (2) the type which proscribes the carrying of "deadly or dangerous weapons"—a "proscriptive" statute.

The legislative history which the majority quotes actually pertains to 49 U. S.C. § 1472(j), added along with § (*l*) by the Anti-Hijacking Statute. Subsection (j) states:

Whoever, while aboard an aircraft in flight in air commerce, assaults, intimidates, or threatens any flight crew member or flight attendant (including any steward or stewardess) of such aircraft, so as to interfere with the performance by such member or attendant of his duties or shall lessen the ability of such member or attendant to perform his duties, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. Whoever in the commission of any such act uses a deadly or dangerous weapon shall be imprisoned for any term of years or for life.

This statute is a "hindsight" type statute. In speaking to this subsection, the House Report stated:

Consideration was given to attempting to define the term "deadly or dangerous weapon." However, this is not practicable. These terms have been used without definition in other provisions of title 18, United States Code, and in many state criminal statutes. The courts will determine, as it arises, whether the weapon in question was deadly or dangerous.

H.R.Rep. No. 958, 87th Cong., 1st Sess. (1961), *reported in* U.S.Code Cong. & Admin.News 2563, 2570 (1961). It is this legislative history on which the majority relies.

Under § (j), the court is dealing with a defendant who has made or attempted an attack upon members of an aircraft's crew.[5] In such situations, the Govern-

---

5. The disparity in the maximum sentence under § (j) versus that in § (*l*), pointed out by the majority, appears to be based on the differences in the nature of the substantive crime proscribed rather than

whether or not intent is required. In fact, if the majority's argument is accepted, because § (m)(1) has the same maximum sentence as § (*l*), and also has an express intent requirement, then an in-

ment can bear the burden of proof as to whether an object was a "deadly or dangerous weapon," and defendant's knowledge of its character, merely by showing the manner in which it was used. Thus, the court in making its findings will always have the benefit of hindsight. Armed with this hindsight, courts have held many objects not intrinsically dangerous nor statutorily proscribed to be "deadly or dangerous weapons" because of the manner in which they were used, including shoes. *See, e. g.,* United States v. Barber, 297 F.Supp. 917 (D. Del.1969), aff'd on point, 442 F.2d 517 (3d Cir. 1971). Consequently, the failure to statutorily define a "deadly or dangerous weapon" in a "hindsight" type statute presents no difficulty for the court in seeking either a definable intent or an ascertainable statutory standard. Necessarily, an ascertainable statutory standard as to what Congress intended to proscribe is present because Congress intended the harsher criminal penalty to attach to the use of any object in a "deadly or dangerous" manner. Coupled with a manifested intent inferred from use, courts merely perform an interpretative function.

In dealing with § (*l*), the congressional history states:

> For the reasons stated in the discussion of subsection (j), it has not been considered feasible or necessary to define the term "deadly or dangerous weapon" as used in this subsection.

H.R.Rep. No. 958, 87th Cong., 1st Sess. (1961), *reported in* U.S.Code Cong. & Admin.News at 2575. However, unlike § (j), § (*l*) is a "proscriptive" type statute. Consequently, the legislative failure to define "deadly or dangerous weapon" for purposes of § (*l*) poses major difficulties not encountered in the lack of definition of the same term under § (j).

I submit the majority have failed to comprehend the differing characteristics of the offenses proscribed under the two separate subsections. Unlike a prosecution under § (j), the court in a § (*l*) prosecution generally will not have the benefit of hindsight. Rather, it will be confronted with the very type of situation which we have here. Defendant manifested no intention to use his knife, nor could the majority even find that he had knowledge that it was a "deadly or dangerous weapon." Had the defendant manifested an intention to use this knife so that it became clear he in fact considered it a "deadly or dangerous weapon," the prosecution would likely have occurred under a "hindsight" provision, such as § (j), rather than under the proscriptive provisions of § (*l*). Therefore, a court's determination under § (*l*) will almost always be in a vacuum because of the lack of either a manifested intent or an ascertainable statutory standard.

Although there are federal and state statutes which have not specific prohibitions, they resemble the "hindsight" language of § (j) rather than the "proscriptive" language of § (*l*). As was noted earlier, those federal and state statutes which in fact are like § (*l*)—such as the unregistered firearm statute in *Freed*—do have express proscriptions and thereby create a presumption and ascertainable standard for the benefit of the prosecutor, the courts, and the defendant and his constitutional right to due process.[6]

There is one federal statute highly similar to § (*l*); this is the maritime equivalent of § (*l*), governing the carrying of weapons aboard ships under the American flag. The relevant portion of the statute states:

> Whoever brings, carries, or possesses any dangerous weapon, instrument, or device, or any dynamite, nitroglycerin,

---

tent requirement likewise must be attributed to § (*l*).

**6.** The proscriptive statute governing the carrying of weapons on the Capitol

grounds, cited by the majority in its opinion at fn. 5, is a representative illustration of the specificity normally incorporated into federal proscriptive statutes.

or other explosive article or compound on board of any vessel . . . .

18 U.S.C. § 2277(a) (1971). By contrast, the relevant portion of § (*l*) states:

> [W]hoever while aboard an aircraft being operated by an air carrier in air transportation, has on or about his person a concealed deadly or dangerous weapon, or whoever attempts to board such an aircraft having on or about his person a concealed deadly or dangerous weapon. . . .

49 U.S.C. § 1472(*l*) (1971).

Unlike § (*l*), which proscribes only *concealed* deadly or dangerous weapons, § 2277(a) proscribes *all* weapons aboard ships. As with § (*l*), however, other than for the enumeration of the various explosive materials proscribed,[7] there is no explication of what constitutes a "deadly or dangerous weapon" for purposes of the statute. Apparently the Government has recognized the difficulties in enforcing this statute, or has brought its prosecution under another section once the allegedly deadly weapon has been used. Since the passage of this section in 1948, only one reported decision has arisen under its provisions, and that involved a civil action. Fall v. Esso Standard Oil Corp., 297 F.2d 411 (5th Cir. 1961), cert. denied, 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55 (1962).

Leaving the determination to the discretion of the judiciary in no way mitigates the lack of such a statutory standard in a "proscriptive" type statute. Merely because in an instance of actual use, a shoe has been held to be a "deadly or dangerous weapon" should not mean that every passenger with a pair of shoes in a carry-on overnight bag should be subjected to criminal liability. Yet, under the majority's standard of whether someone could consider or use those shoes as a "deadly or dangerous weapon"—as in fact someone has—the passenger could be subjected to arrest and conviction for violation of this subsection.

Such a delegation to the courts impermissibly thrusts them into a legislative role each time a prosecution is brought under this subsection. Since the majority claim no intent is required under the statute, the court is forced to make a legislative type inquiry into whether the object defendant is charged with carrying should be considered a "deadly or dangerous weapon" if carried aboard a plane. If it so finds, then it must make a legislative decision that such an object should be absolutely proscribed aboard aircraft. Once having done so, it must change its legislative pen for judicial garb and convict the defendant for violating the absolute proscription which it has just legislated. The very elucidation of such a proposition reveals its error.

Further, even if the Government can move the court to declare a particular object a "deadly or dangerous weapon" in an individual prosecution, the Government must then prove under *Freed* that the defendant knew the object to be a "deadly or dangerous weapon" in those circumstances. Absent some threatening manifestation by the defendant, I believe such burden to be practically impossible for the Government to carry. The instant case illustrates the problem fully: the majority, unable to find the requisite knowledge proven as to defendant, upholds his conviction on the ground he *should have been aware* other people *could* have considered or used his pocketknife as a deadly or dangerous weapon if carried aboard a plane. That the majority has in fact legislated an absolute proscription against pocketknives on which it has then proceeded to convict defendant is manifestly apparent.

Rather than emasculating § (*l*), as the majority implicitly contends my conclusion would do, it is Congress which has failed to draft an enforceable "proscriptive" type statute in the first instance. In attempting to salvage this

---

7. Similar provisions have been added by regulation proscribing the carrying of explosives aboard aircraft. 14 C.F.R. § 103.1 et seq. (1972).

unuseable provision with a broad legislative brush, I believe the majority has committed its third error of law.

## V. THE FAILURE TO COMPLY WITH DUE PROCESS STANDARDS.

In ignoring the mandate of the Supreme Court in *Freed,* and possibly that contained in *Lambert,* the majority has turned § 1472(*l*) into a statute which cannot withstand constitutional scrutiny. Basically, they have rescinded the presumption of innocence and replaced it with a presumption of guilt. This is highlighted by the majority's statement: "As in the *sentencing* in this case, courts will have to balance the potential harm to innocent passengers with what could be an *unknowing* act by defendant." [Emphasis supplied.] I submit that this is repugnant to fundamental constitutional precepts.[8]

Under the majority's standard, no intent or knowledge of any kind is required for conviction. If the judge be convinced that the item defendant carried could be used as, or even considered by, someone on the plane—not necessarily the person carrying the item—a deadly or dangerous weapon, he could be convicted under this statute. In this case, the majority says it is irrelevant whether the defendant considered his knife a tool since someone else could have considered it a weapon. Thus, under this test of culpability, attempting to board a plane with an item which has been found by any court at any time, regardless of circumstances, to be a deadly or dangerous weapon would be a criminal offense. Too, even though no court had previously considered the object a deadly or dangerous weapon, if the judge found the object could be so used aboard a plane, then he would have to convict whether or not defendant's conduct was otherwise innocent. Thus, one could be arrested for attempting to carry a concealed pair of shoes, which have been judicially determined to be deadly or dangerous weapons,[9] aboard a plane, or for carrying a concealed set of knitting needles, as inherently dangerous as any knife even though they have never to date been so classified by a court. Making such innocent conduct a criminal offense violates due process per se. Lambert v. California, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

Since the purported purpose of § (*l*) is to keep *all* weapons off planes, anyone carrying anything which could conceivably be a weapon aboard a plane would have to be not only arrested but also convicted. Only in sentencing could the court take into account the unknowing nature or innocence of the defendant's act. The majority's conclusion that an inventory of proscribed items would be impracticable is true. The list would be endless and all-inclusive. The potential for abusive and discriminatory application is manifest.

Vesting such discretion in the hands of law enforcement officers, and in the courts, has been held violative of due process too many times to recount. The most recent pronouncement on this issue by the Supreme Court was in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Although that case involved a First Amendment problem, the majority of the Supreme Court made clear that certain standards applied in testing all laws under the "vagueness" standard. The Court stated:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he

8. I note that although the unconstitutionality of the majority's result was not raised in this court, it was raised before the Magistrate. However, I believe even so, the constitutional breach here contemplated, which goes to the validity of the subsection, comes within the ambit of clear error under Fed.R.Crim.P. 52(b).

9. United States v. Barber, 297 F.Supp. 917 (D. Del. 1969), aff'd on point, 442 F. 2d 517 (3d Cir. 1971).

may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory enforcement.

*Id.* at 108–109, 92 S.Ct. at 2298–2299 (footnotes omitted).

Relying upon these principles, our own circuit and the District of Columbia Circuit have recently determined a statute which possessed the same potential for arbitrary enforcement and harassment to be unconstitutionally vague. It is to be noted that First Amendment freedoms were not directly involved in either. The statutes there struck down vested in military authorities and its judicial tribunals the unbridled authority to determine what actions were to the detriment of the discipline and good order of the military. Additionally, the decision in this circuit struck down on similar grounds the statute allowing punishment of conduct unbecoming an officer.[10]

I find the same problems here. The court has the power in each individual instance to determine whether it will hold the object to be a "deadly or dangerous weapon." Thus, one could be punished for carrying, without any manifested intent to use, any object conceivably capable of use in the proscribed manner. Because most anything could become a deadly or dangerous weapon if so wielded, and because Congress has given no standards by which such determinations are to be made in the absence of any manifested use, a reasonable man reading this statute would not be adequately forewarned of what is considered criminal conduct under its provisions.[11]

The majority, in their opinion, state that requiring a specification of those objects to be proscribed per se aboard planes would unreasonably restrain agents at the gate in their efforts to prevent hijackings. However, in so saying, they have confused the distinction between delegating to agents at the gate the power to search individuals and to remove objects which might be considered potentially dangerous if carried aboard an aircraft, and allowing the agents to make arrests based upon those seizures. I reemphasize that my opinion does not go to the first power; it only goes to the legitimacy of the exercise of the second power—the power to arrest.

By their holding, the majority have placed a judicial imprimatur upon discretionary and discriminatory enforcement of this subsection by those agents, both in this case and for future cases. The majority's implicit answer—that the courts can weigh the relative innocence or lack of knowledge of the individual at sentencing rather than at the initial determination of guilt—is no solace to an innocent individual who is branded a criminal. Such action is repulsive to establish concepts of due process.

The potential for abuse under the majority's holding is nowhere better highlighted than by an examination of the facts shown on the record in the instant case. After defendant was detained pursuant to his registering a positive reading on the magnetometer, and after the defendant had responded negatively to the officer's inquiry as to what he was carrying, the officer immediately conducted a search of defendant's shoulder bag. In it, he found approximately

10. Avrech v. Secretary of the Navy, 477 F.2d 1237 (D.C.Cir., 1973); Levy v. Parker, 478 F.2d 772 (3d Cir., 1973). For a particularly good discussion of the dangers of this type of statute and its foreign nature to our system of constitutional democracy, see Levy v. Parker, *supra*, at 788–792.

11. To the extent this subsection resultantly makes criminal that which is normally innocent conduct, the previously discussed problems under *Lambert* are raised.

$12,000 cash. The officer then misrepresented to defendant that it was illegal to carry more than $5,000 across state lines without first notifying the Internal Revenue Service. Whether this served as the pretext for defendant's detention, or whether the agent completed his search then or at some later point in an attempt to justify the detention, is unclear from the record. Suffice it to say that at some point, the defendant's person was searched, and the knife—on which the present conviction is based— was found. There was an innuendo at trial that the agent suspected the money to be the fruits of a bank robbery or other such illegal act and called in the Federal Bureau of Investigation.

It is important to note what is not presented here. Defendant neither consented to the search of his shoulder bag nor of his person. He was not asked to identify himself at the gate, and when finally asked after being taken into custody, he responded truthfully and provided corroborative identification. Thus, probable cause was neither established by an evasive response to a request for identification nor negatived by consent. Nor, lacking consent, did the agent make any attempt to minimize the Fourth Amendment intrusion. Recommended procedures specify that consent to search the person be first requested and, if given, the search be conducted. Should that prove unproductive, consent to search the person's hand luggage should be requested. The agent here did not even make a feint at complying with these procedures. *Compare with* United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972).

Further evidence of such discriminatory enforcement is revealed in recent figures published by the Federal Aviation Agency. In January, 1973, 149 guns, 365 knives, and 131 other weapons were seized by enforcement officials at the gate or were found hidden in airports. This adds up to a total of 645 concealed weapons seized. However, for all of these seizures, only 57 arrests were made. The December, 1972 figures illustrate even more graphically the random and selective enforcement of this statute. That month 1,536 weapons were seized, while only 37 arrests were made.[12] Thus, contrary to the Government's contentions, undefined criteria other than the mere fact of possession are being used to determine who will be arrested for violation of this statute. Such manifested arbitrary enforcement is sufficient to render this statute unconstitutional as currently applied.

These constitutional problems are significantly mitigated by the actual burdens thrust upon the Government under *Freed*. The majority and the Government contend that the responsible regulatory agency, or Congress, should not be required to make a listing of those items which it might feel to be inherently "deadly or dangerous" if carried aboard an airplane. Failure to do so, in view of *Freed*, leaves the subsection practically impossible of enforcement and opens its provisions to arbitrary and abusive enforcement. Obviously, other "proscriptive" statutes specify those objects within their respective coverage. Under these statutes, law enforcement officials are impeded in their efforts to enforce criminal proscriptions against other objects outside the express statutory proscription. However, due process requires no less.

This is not to say Congress itself must draw the specifications. A specific legislative function has been delegated to the Civil Aeronautics Board for the administration of air transportation, and it operates as an arm of the legislature. It is up to the CAB, and not the courts, to draft applicable regulations on proscribed weapons; the judiciary should not be forced into improperly assuming such a legislative role. Neither should the individual be forced to risk arrest and conviction for unknowing and unspecified conduct each time he becomes an air passenger. Until such

12. Wall.St.J., p. 5, col. 3 (3/29/73).

time as such regulations are drafted and promulgated, the Government's interest is equally served by requiring surrender, without any attendant criminal liability and with proper provisions for return, of those objects which officials feel pose a threat if carried aboard a plane. That, in fact, appears to be the procedure presently utilized except for selective and highly suspect criminal enforcement, such as the instant case.

## VI. CONCLUSION.

In short, the majority, at the minimum, have refused to impose the burden of proof upon the Government mandated by the Supreme Court in United States v. Freed and United States v. International Minerals & Chemical Corp. Further, as a consequence of their refusal to require definition of items proscribed, they have left innocent conduct open to criminal prosecution under the terms of §, $(l)$, in violation of the mandate of the Court in Lambert v. California. Finally, because of these failures, the majority has left this statute open to arbitrary and discriminatory application. Consequently, as interpreted by the majority, this subsection is unable to withstand constitutional scrutiny.

While I too feel the pressures which have caused the majority to reach the present conclusions, I cannot countenance this judicial abdication of responsibility under the doctrine of present exigencies. Not only does the majority opinion jeopardize the due process rights of individuals, but it also sanctions the legislative failure to provide a workable statute or regulations by which law enforcement officials can legally protect the air traveling public.

Although law enforcement officials and the courts are legitimately concerned about the current dangers posed by air piracy, the right to travel by air in this country cannot be conditioned upon the total waiver of one's substantive constitutional rights merely because of the presence or immediacy of such dangers. It is only where the constitutional intrusion is minimal that there can be any weighing of the societal interest in maintaining the safety of the airways against the strong societal interest in preserving constitutional rights inviolate. The waiver of an individual's Fifth Amendment right to due process of law in exchange for the right to travel in air commerce, here contemplated by the majority opinion, cannot be considered such a minimal intrusion. Particularly in times of stress, constitutional rights must be jealously guarded lest they become mere platitudes to be enforced at the pleasure of a temporary majority.

Therefore, I would reverse the defendant's conviction.

Judge FORMAN and Judge GIBBONS concur in this opinion.