**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Regina Kay GARRETT, Defendant–Appellant.**

No. 92–3483.

United States Court of Appeals, Fifth Circuit.

Feb. 18, 1993.

Eugene P. Cicardo, Alexandria, LA, for defendant-appellant.

Herbert W. Mondros, Asst. U.S. Atty., Harry Rosenberg, U.S. Atty., New Orleans, LA, for plaintiff-appellee.

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Like many people trying to catch a plane around the holidays, Regina Kay Garrett was in a hurry. Unlike most, she forgot that she had a gun in her purse, or so she says. The principal question we decide today is whether the federal statute that criminalizes this conduct requires any degree of *mens rea* as an element of the offense. We hold that a "should have known" standard applies.

## Facts and Proceedings Below

On December 18, 1990, Regina Kay Garrett was a ticketed passenger for and attempted to board flight 457 of L'Express Airlines, a regularly scheduled commercial commuter airline, from New Orleans to Alexandria, Louisiana. Passing through the New Orleans airport security, Garrett was stopped when the security guard monitoring the X-ray scanner noticed a dark mass in the hand bag that Garrett had placed on the conveyor belt. A consensual search of the bag was conducted and a small hand gun was discovered therein. The gun, a Browning .25 caliber semi-automatic, was loaded with six rounds in the magazine and one in the chamber. Garrett told security personnel that she had forgotten that the gun was in her purse.[1]

Garrett was charged in a one count bill of information with attempting to board an aircraft with a concealed weapon in violation of the Federal Aviation Act (the Act or the statute). *See* 49 U.S.C.App. § 1472(*l*)(1).[2] Garrett waived her right to

---

1. Airport security officials confiscate approximately 2,500 firearms each year, or about seven a day. *See* McDowell, *Guns at Airports, an Everyday Event*, N.Y. Times, Dec. 29, 1992, at A9. Recently, singer and pianist Harry Connick, Jr., was arrested in New York's John F. Kennedy International Airport for this offense. Notably, the *Times* reports that, "Most of those arrested ... are like Mr. Connick: they say they simply forgot they were carrying guns to the airport." *Id.*

2. 49 U.S.C.App. § 1472(*l*) provides in pertinent part:
"(1) With respect to any aircraft in, or intended for operation in air transportation or intrastate air transportation, whoever—(A) while aboard, or while attempting to board such aircraft has on or about his person or his property a concealed deadly or dangerous weapon which is, or could be, accessible to such person in flight; ... shall be fined not more than $10,000 or imprisoned not more than one year, or both."

a jury trial and the cause was tried by consent before a United States Magistrate Judge. On January 14, 1992, the magistrate denied Garrett's motion to dismiss the bill of information. On January 23, 1992, a bench trial was held and Garrett was found guilty. Garrett was sentenced to five years' probation and a $25 special assessment. As a special condition of probation, the magistrate ordered Garrett to reside for six months in a halfway house. Garrett appealed her conviction and sentence to the district court, 18 U.S.C. § 3402, and, on May 5, 1992, the district court affirmed the magistrate's decision. Garrett made a timely appeal to this Court. 28 U.S.C. § 1291.

## Discussion

On appeal, Garrett raises three points of error. First, Garrett argues that the Act does not apply to her because her flight was to be wholly within the state of Louisiana. Second, she argues that her conviction is invalid because the magistrate did not find that she had actual knowledge that the gun was in her purse.[3] Third, Garrett argues that when the magistrate calculated her sentence she was entitled to, but did not receive, a three point reduction of her offense level pursuant to section 2K1.5(b)(3) of the U.S. Sentencing Guidelines (U.S.S.G.).

## I. The Statute's Applicability

Garrett challenges the applicability of the statute to her conduct. By its own terms, section 1472(*l*) applies to "any aircraft in, or intended for operation in air transportation or intrastate air transportation." The latter term, "intrastate air

We pause to mention that the statute at issue in this appeal is section 1472(*l*), not section 1472(1). The typographical similarity between the lower case *"l"* and the number one has been the source of some confusion surrounding the citation of section 1472. *See United States v. Mena*, 933 F.2d 19, 22 n. 2 (1st Cir.1991).

**3.** Garrett also makes the related argument that the bill of information with which she was charged was insufficient, and should have been dismissed, because it did not allege actual knowledge of the gun's presence as an element of the crime.

transportation" is defined elsewhere in the statute as "the carriage of persons or property as a common carrier for compensation or hire, by turbojet-powered aircraft capable of carrying thirty or more persons, wholly within the same State of the United States." 49 U.S.C.App. § 1301(26). The government concedes, as it must, that the plane Garrett attempted to board was not in "intrastate air transportation"; the L'Express aircraft at issue—a Beech 1900 turboprop—seats only nineteen passengers.

■ The real question, then, is whether the plane was engaged in "air transportation," which the statute defines as "interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." 49 U.S.C.App. § 1301(10). There is no evidence or claim that the plane was engaged in overseas or foreign air transportation, or carried mail. Relying on the term "interstate" as its textual hook, the government observes that on December 18, 1990, the L'Express plane carried passengers to multiple destinations in three states.[4] The government points out that the plane crossed state borders on the next day also. Garrett responds that the flight for which she was ticketed was wholly within the state of Louisiana—from New Orleans to Alexandria—and thus the plane would not have been in interstate transportation during the time that she was to be on board. To underscore the singularity of her flight, Garrett notes that the plane changed L'Express flight numbers upon its arrival in New Orleans from Houston, Lake Charles, and Lafayette, and received a new crew.

**4.** On that day, the aircraft originated in Birmingham, Alabama, and flew to Mobile, Alabama, before proceeding to three Louisiana destinations: New Orleans, Lafayette, and Lake Charles. From Lake Charles, the plane flew to Houston, Texas. From Houston, it flew back to Lake Charles, to Lafayette, and then to New Orleans, where Garrett attempted to board. From New Orleans, the plane flew to three cities in Louisiana (Alexandria, Shreveport, and Baton Rouge) before finally returning to New Orleans. All of these were regularly-scheduled L'Express Airline flights.

In essence, the parties' dispute is over what slice of time we should examine in order to characterize the plane's movements. The government would have us view the plane's journeys over a period of one or two days; Garrett wants us to examine only that span of time during which she would have been a passenger. The statute, unfortunately, provides no guidance as to the proper scope of the inquiry and we decline to formulate a precise rule at this time. On the facts of this case, we hold that the plane was intended for operation in interstate transportation.

On the same day and not long before L'Express Airlines flight 457 was scheduled to depart from New Orleans for Alexandria, the plane had come from Houston, Texas, on a regularly scheduled L'Express Airlines flight.[5] It is thus clear that this plane was intended, in part, to carry passengers who might wish to fly L'Express between Houston and Alexandria.[6] Thus, on the flight on which Garrett was scheduled to fly, the aircraft was *intended* to be available for the purpose of, and could actually have been, transporting passengers who were traveling from one state to another. This satisfies us that the plane came within the ambit of section 1472(*l*) at least during Garrett's flight. There is no evidence that any Houston passengers in fact flew on flight 457, and we hence assume that none actually did. But, section 1472 applies to "any aircraft in, *or intended for operation in*" interstate air transportation. Therefore, it is enough, we think, that the flight 457 aircraft was operated with the intent of its being a potential component of someone's interstate travels on L'Express Airlines.[7]

## II. The Statute's *Mens Rea* Requirement

Garrett's next argument on appeal is that her conviction should be overturned because the government did not prove, nor even attempt to prove, that she had knowledge that the gun was in her purse when she attempted to board the L'Express flight. The government's position is that section 1472(*l*)(1) is a strict liability offense and contains no intent requirement whatsoever. The magistrate, eschewing both extremes, declared that "this Court is of the opinion that it would be consistent with Fifth Circuit jurisprudence and the United States Constitution to apply a 'should have known' standard to this misdemeanor offense." We agree.

### A.

Whether section 1472(*l*)(1) contains a *mens rea* requirement is a question that a number of other circuit courts seemingly addressed during the 1970's. The government cites *United States v. Flum*, 518 F.2d 39 (8th Cir.) (en banc), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975); *United States v. Dishman*, 486 F.2d 727 (9th Cir.1973); and *United States v. Margraf*, 483 F.2d 708 (3d Cir.) (en banc), *vacated and remanded*, 414 U.S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734 (1973); for the proposition that section 1472(*l*)(1) contains no intent requirement. Garrett offers *United States v. Lee*, 539 F.2d 606 (6th Cir.1976), for the counter proposition.[8] We believe that none of these courts were squarely presented with, or actually decided, the precise issue before us.

In *Flum*, the defendant attempted to board an aircraft with a switchblade and a

---

**5.** The plane left Houston as L'Express Airlines flight 331 at 1:00 p.m. and landed in New Orleans (after quick stops in Lake Charles and Lafayette) at 3:10 p.m. Flight 457 left New Orleans (sans Ms. Garrett) at 4:00 p.m.

**6.** Flight 457 went to Alexandria, Shreveport, and Baton Rouge, before returning to the Crescent City.

**7.** We do not foreclose the possibility that a broader principle might be applied to facts such as these to support a finding that a plane was

engaged in interstate air transportation. But that decision must wait for another day. *Cf. United States v. Delacerda*, 474 F.2d 857, 858 (9th Cir.1973) (holding that an airline was engaged in air transportation under 49 U.S.C. § 1301(10) where the airline "was properly engaged in the transportation of United States mails *on some routes*") (per curiam; emphasis added).

**8.** For a general discussion of these four cases, see Annotation, 109 A.L.R.Fed. 488, 526–28 (1992).

butcher knife in his carry-on baggage. The issue in *Flum*, however, was not whether the defendant knew that he was carrying the knives, but rather whether he had intended to *conceal* them:

"In this appeal Flum contends that he was convicted upon insufficient evidence since there was no evidence tending to establish that he *intended to conceal the knives* which were discovered during a preboarding search of his carry-on luggage and personal belongings." 518 F.2d at 40 (footnote omitted; emphasis added).

There is no suggestion in *Flum* that the defendant did not know that he was carrying the knives. Indeed, the court pointedly observed that, "No issue of scienter is present in this case. It is undisputed that defendant knew the nature and approximate location of each of the knives." *Id.* at 44 n. 10. On the merits, the court held that intent to conceal is not an element of a section 1472(*l*) violation.[9]

In *Dishman*, the defendant was carrying a .22 caliber starter pistol. The question presented to the Ninth Circuit was whether the gun, which was capable only of firing blanks, was a "deadly or dangerous weapon" within the meaning of the statute. (The answer was yes.) Thus, despite such general statements as "[s]ubsection (*l*) is a non-intent statute," 486 F.2d at 732, it is clear that the defendant's knowledge was not an issue before the *Dishman* court. To the extent that *Dishman* discussed an intent requirement, what the court said was that, to be guilty of violating section 1472(*l*), one need not intend to use the weapon in a dangerous way while in flight: "Any necessary element of present or later

developed intent to make use of the 'deadly and dangerous' weapon in the commission of a crime while aboard the aircraft is conspicuous by its utter absence." *Id.* at 730.[10]

In *Margraf,* the defendant attempted to board while carrying a folding pocket knife. The question before the Third Circuit was not whether the defendant knew that he was carrying the knife or what its physical characteristics were (which he plainly did), but rather whether he knew that the knife was legally a deadly or dangerous weapon. In other words, the knowledge issue in *Margraf* was whether section 1472(*l*) contains a specific intent requirement. To be sure, there is language in *Margraf* which would suggest a broader reading. *See, e.g.,* 483 F.2d at 720 (Seitz, C.J., dissenting) ("Under the majority's standard, no intent or knowledge of any kind is required for conviction."). However, there is no doubt that the issue before *Margraf* was specific intent:

"[Appellant] claims that it is necessary for the government to prove a specific intent to carry a 'concealed deadly or dangerous weapon' onto a plane in order for a defendant to be convicted. In other words, it is not sufficient for the government to show that a defendant was boarding a plane with a concealed deadly weapon on his person; it must go further and show that the defendant *was aware that his weapon was dangerous*, and knowing this, still intended to carry the weapon aboard." *Id.* at 709 (emphasis added).

The Third Circuit rejected this argument and instead affirmed the defendant's con-

---

**9.** Nor has *Flum* been given a broader interpretation in subsequent cases. *See United States v. Collins,* 949 F.2d 1029, 1031 (8th Cir.1991). *Collins* is the only reported Eighth Circuit case to cite *Flum*.

**10.** The government also cites the Ninth Circuit case of *United States v. Wallace,* 800 F.2d 1509 (1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1901, 95 L.Ed.2d 507 (1987). However, *Wallace* merely holds that (following *Dishman* ) a stun gun is a dangerous·weapon under the statute and that (following *Flum* ) intent to conceal is

not required by section 1472(*l*). The latter holding is arguably dicta in that, apart from the question of a stun gun's dangerousness, "the parties stipulated to the existence of all elements necessary for a conviction under 49 U.S.C. § 1472(*l*)." 800 F.2d at 1513. The only Ninth Circuit case other than *Wallace* to cite *Dishman* is *United States v. Patterson,* 664 F.2d 1346, 1348 (1982), which cited *Dishman* for the familiar proposition that criminal statutes are to be construed narrowly in favor of the defendant.

viction on the ground that he "should have been aware that it could be used as a deadly weapon." *Id.* at 712.[11]

The case cited by Garrett, *United States v. Lee,* is a procedurally peculiar case. The defendant-appellant, Billy Ray Lee, was stopped with a hand gun in his brief case. Lee claimed that he had placed the gun in the case the night before and had forgotten that it was there. Lee consented to be tried by a magistrate judge, who found him guilty as charged. On the issue of intent, the magistrate held that it was unnecessary to determine whether Lee knew that the gun was in his brief case, because the statute did not make intent an element of the offense. Lee appealed to the district court, which reversed on the ground that knowledge of the presence of the weapon is an element of the crime. The district court then remanded to the magistrate to determine whether Lee had knowingly possessed the gun. After the case was remanded, the magistrate denied Lee's motion seeking a jury trial, retried the case upon the same evidence, and once again

found Lee guilty. The district court affirmed the magistrate's decision and Lee appealed to the Sixth Circuit. Lee raised as error both the magistrate's refusal to permit him to withdraw his earlier jury trial waiver and the holding that knowing possession was an element of section 1472(*l* ).[12]

The Sixth Circuit agreed with the district court that "§ 1472 required a finding that appellant knew of the presence of the concealed dangerous weapon." *Lee,* 539 F.2d at 608. In the very next sentence, however, the court explained that, "Nevertheless, Lee's conviction must be reversed because he should have been permitted to withdraw his consent to trial before a magistrate." Because Lee's conviction was reversed on that ground, the court's approval of the district court's conclusion as to section 1472(*l* )(1)'s *mens rea* requirement is dicta.[13]

In sum, the precise issue before this Court was not present in *Flum, Dishman,* or *Margraf,* and was addressed in *Lee* only by dicta; we appear to be the first appel-

**11.** *Margraf* 's subsequent history was curious. At the urging of the Solicitor General, the Supreme Court granted certiorari in *Margraf* and then vacated and remanded the decision to the Third Circuit. 414 U.S. 1106, 94 S.Ct. 833, 38 L.Ed.2d 734 (1973). The Solicitor General recommended that the complaint against Margraf be dismissed because his knife, which had only a 3¼ inch blade, did not meet the definition of a "weapon or dangerous object" under FAA guidelines. The Solicitor General did not concede, however, that section 1472(*l* ) contains any requirement of specific intent or scienter. Upon remand, the Third Circuit ordered the district court to dismiss the case. 493 F.2d 1206 (1974).

It is uncertain whether *Margraf,* which has been cited only twice in the Third Circuit, remains good law. *United States v. Harris,* 381 F.Supp. 1095 (E.D.Pa.1974), broadly pronounced that "as long as [*Margraf* ] remains the law of this Circuit, knowledge plainly is not a requisite for a conviction under 49 U.S.C. § 1472(*l* )." *Id.* at 1101. That conclusion, however, is pure dictum inasmuch as the court found ample evidence that the defendant had such knowledge. *See id.* ("*absent* the Magistrate's finding of knowledge, I would apply [*Margraf* ] to the present action") (emphasis added; footnote omitted). The other case citing *Margraf, United States v. Wilkinson,* 389 F.Supp. 465, 468 (W.D.Pa.), *aff'd,* 521 F.2d 1400 (3d

Cir.1975) (table), merely mentions the dissent in *Margraf* for a proposition unrelated to section 1472(*l* )'s intent requirement.

**12.** Strangely enough, Lee raised the latter issue at the request of the U.S. Attorney.

**13.** After the Sixth Circuit's decision, the government proceeded against Lee a third time. "It has been established as the law of this case," a subsequent court noted, that "Mr. Lee cannot be convicted of violating 49 U.S.C. § 1472(*l* ) if he did not know—had forgotten—that he had the weapon involved in his brief case." *United States v. Lee,* 435 F.Supp. 974, 982 (E.D.Tenn. 1976). However, in support of this proposition the court cited not the Sixth Circuit's *Lee* opinion, but the district court decision prior to *Lee* which had held that section 1472(*l* )(1) requires knowledge.

*Lee* has been cited in the Sixth Circuit only twice, both times for propositions related to a defendant's withdrawal of consent to trial by magistrate. *See United States v. Martin,* 704 F.2d 267, 271 (6th Cir.1983); *United States v. Groth,* 682 F.2d 578, 579 (6th Cir.1982). *But cf. United States v. Busic,* 592 F.2d 13, 21 (2d Cir. 1978) (citing *Lee* for the proposition that "[t]he offense of aircraft piracy ... requires a showing of general criminal intent, not a showing of specific criminal intent.").

late court to pass on the question.[14]

### B.

In determining whether section 1472($l$)(1) contains a *mens rea* requirement, our overarching task is to give effect to the intent of the Congress. The Congress is fully capable of creating strict liability crimes when it is their intent to do so. *See Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.") (citation omitted). Of course, the Congress cannot do so in a way that transgresses constitutional boundaries.[15] Accordingly, to give due respect both to the will of the Congress and the mandate of the Constitution, we construe the acts of Congress, whenever possible, so as to avoid raising serious constitutional questions. *See, e.g., Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 464–69, 109 S.Ct. 2558, 2572–73, 105 L.Ed.2d 377 (1989).

Our effort to discern Congress' intent must begin, of course, with the statute's language. By its explicit terms, *see supra* note 2, the statute makes no mention of *mens rea*. But before going any further, we reject a textual argument made by the government. That section 1472($l$)(1) contains no *mens rea* requirement, the government maintains, must be inferred from the fact that the very next subsection does so explicitly.[16] Variations of this argument have been made before. *Cf. Margraf*, 483 F.2d at 710. To be sure, the fact that section 1472($l$)(2) speaks of willful or reckless violations of section 1472($l$)(1) is convincing evidence that one need not act willfully or recklessly to violate section 1472($l$)(1). One cannot infer from section 1472($l$)(2), however, that section 1472($l$)(1) contains *no mens rea* requirement *whatsoever.* There is a range of culpability between recklessness or willfulness, on the one hand, and total blamelessness, on the other, the most familiar of which is ordinary negligence. Therefore, the absence of knowledge is not the necessary converse of willfulness. So too, in some contexts, it takes more than knowledge for a violation to be willful. *See, e.g., Cheek v. United States*, 498 U.S. 192, 199–204, 111 S.Ct. 604, 609–12, 112 L.Ed.2d 617 (1991) (conviction for willful failure to file a federal income tax return and willful evasion of income taxes requires the voluntary, intentional violation of a known legal duty).

Thus, we are left with a statute which is, as we see it, silent on the question

---

**14.** One district court case that did squarely address the issue is *United States v. Pou*, 484 F.Supp. 972 (S.D.Fla.1979). In *Pou*, the defendant was charged with a violation of section 1472($l$) and moved to dismiss the bill of information with which he was charged on the ground that it did not allege knowledge as an element of the crime. Citing *Lee*, the *Pou* court agreed with the defendant: "Knowledge of the presence of a concealed dangerous weapon is an element of the offense codified in 49 U.S.C.A. § 1472." *Id.* at 974. We have found no reported citations to *Pou*, and, as we shall see, we do not agree with it entirely.

**15.** The Supreme Court has indicated that, under some circumstances, the imposition of criminal liability without *mens rea* violates due process. *See, e.g., Lambert v. California*, 355 U.S. 225, 227, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957) (Los Angeles ordinance requiring felons to register their presence in the city "violates due process where it is applied to a person who has no actual knowledge of his duty to register"). *See also United States v. Wulff*, 758 F.2d 1121, 1125

(6th Cir.1985) (felony provisions of the Migratory Bird Treaty Act, which prohibit the sale of migratory birds, violate due process because of "the absence of a requirement that the government prove some degree of scienter"); *but see United States v. Engler*, 806 F.2d 425, 432–34 (3d Cir.1986), *cert. denied*, 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987) (declining to follow *Wulff*). In the wake of *Wulff*, the Congress amended the Act to require violations of its felony provisions to be committed "knowingly." *See* 16 U.S.C. § 707(b). The misdemeanor provisions of the Migratory Bird Treaty Act are discussed *infra* in connection with *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir.1978).

**16.** 49 U.S.C.App. § 1472($l$)(2) provides:

"Whoever willfully and without regard for the safety of human life, or with reckless disregard for the safety of human life, shall commit an act prohibited by paragraph (1) of this subsection, shall be fined not more than $25,000 or imprisoned not more than five years, or both."

of *mens rea.* Yet, "certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." *United States v. United States Gypsum Co.,* 438 U.S. 422, 438, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978). The requirement of *mens rea* as predicate to criminal liability is a fundamental precept of the Anglo–American common law. As Justice Jackson eloquently stated:

> "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952) (footnote omitted).

So deeply rooted is this tradition that it is presumed that the Congress intended to incorporate some requirement of *mens rea* in its definition of federal crimes, although that presumption is rebuttable. Accordingly, "the failure of Congress explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from this background assumption of our criminal law." *Liparota,* 471 U.S. at 426, 105 S.Ct. at 2088. *See also* 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.1, at 579 (1986) ("the absence of words in the statute requiring a certain mental state does not warrant the assumption that the legislature intended to impose strict liability"). In short, we will presume that Congress intended to require some degree of *mens rea* as part of a federal criminal offense absent evidence of a contrary congressional intent.

This presumption is well established, too, in the case law of this Circuit. A seminal case in this regard is *United States v.*

*Delahoussaye,* 573 F.2d 910 (5th Cir.1978), in which defendants were convicted of duck hunting in violation of federal regulations promulgated pursuant to the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.* These regulations, 50 C.F.R. § 20.21(i), prohibit the shooting of migratory game birds over a baited field. Reasoning that hunters might innocently violate these regulations by hunting over a field without knowledge that it was baited, we held that "a minimum form of scienter—the 'should have known' form—is a necessary element of the offense." *Id.* at 912. "Any other interpretation," we said, "would simply render criminal conviction an unavoidable occasional consequence of duck hunting." *Id.* at 912–13.[17]

In *United States v. Anderson,* 885 F.2d 1248 (5th Cir.1989) (en banc), defendant was convicted of violating the National Firearms Act, 26 U.S.C. § 5861 *et seq.* Concluding that this Court's "precedent permitting conviction of certain felonies without proof of *mens rea* ... is aberrational in our jurisprudence," *id.* at 1249, we reversed his conviction on the ground that the government had failed to prove that he knew that the guns were automatic weapons (and hence prohibited by the Act). We said at the time:

> "We think it far too severe for our community to bear—and plainly not intended by Congress—to subject to ten years' imprisonment one who possesses what appears to be, and what he innocently and reasonably believes to be, a wholly ordinary and legal pistol merely because it has been, unknown to him, modified to be fully automatic." *Anderson,* 885 F.2d at 1254 (footnote omitted).

In *United States v. Wallington,* 889 F.2d 573 (5th Cir.1989), defendant was convicted of divulging information that he had obtained within the scope of his official

---

**17.** The holding in *Delahoussaye* is, as its author, Judge Gee, later conceded, "Unique among the Circuits." *United States v. Sylvester,* 848 F.2d 520, 522 (5th Cir.1988); *see also Catlett v. United States,* 471 U.S. 1074, 1075, 105 S.Ct. 2153, 2154, 85 L.Ed.2d 509 (1985) (White, J., dissenting from denial of certiorari) (noting split in the circuits). Some evidence has emerged that *De-*

*lahoussaye* is contrary to the intent of a subsequent Congress. *See* S.Rep. No. 445, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128 ("Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions.").

duties as a United States Customs agent in violation of 18 U.S.C. § 1905. We rejected his arguments that the statute was overbroad and vague by construing it narrowly to apply only to information that the employee knows to be confidential. "We do not believe that Congress intended to create strict criminal liability and impose prison sentences of up to one year for innocent disclosures of information." *Id.* at 578.

In *United States v. Nguyen*, 916 F.2d 1016 (5th Cir.1990), defendant was convicted of possessing and importing a threatened species of sea turtle (*caretta caretta*) in violation of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* We affirmed and held that the Act contained no specific intent requirement: "it is sufficient that Nguyen knew that he was in possession of a turtle. The government was not required to prove that Nguyen knew that this turtle is a threatened species or that it is illegal to transport or import it." *Id.* at 1018. We distinguished *Anderson*, and refrained from reading into the Act a more demanding *mens rea* requirement, because Congress had made its intent clear: "The [House] committee explicitly stated that it did 'not intend to make knowledge of the law an element of either civil penalty or criminal violations of the Act.'" *Id.* at 1019 (quoting the legislative history).

Here, the text of section 1472(*l*)(1) provides no indication that the Congress intended to depart from the default rule of requiring some *mens rea.* Nor is there anything in the legislative history of the Federal Aviation Act that would lead us to believe that the Congress intended section 1472(*l*)(1) to be a wholly strict liability offense.[18] At the same time, we think that a serious due process problem would be raised by application of this statute, which carries fairly substantial penalties, to someone who did not know and had no reason to know that he was carrying a weapon.[19] *Cf. United States v. Lee*, 383 F.Supp. 1033, 1035 (E.D.Tenn. 1974). Avoiding such a construction of section 1472(*l*)(1), moreover, would comport with the so-called "rule of lenity"—the principle that ambiguous criminal statutes should be construed in favor of the defendant. Therefore, in light of the principles laid down by the Supreme Court and our case law, we cannot conclude that the Congress intended section 1472(*l*)(1) to reach persons acting without any *mens rea* whatsoever.[20]

18. The legislative history of section 1472(*l*)(1) does not indicate that Congress intended to require *mens rea;* nor does it explicitly disclaim any such intent. *See* H.R.Rep. 958, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.C.C.A.N. 2563, 2574–75. The history of section 1472(*l*)(2),— the Act's felony provisions, discussed *supra*— which was added as a part of the 1974 amendments to the Act, is similarly unenlightening with respect to section 1472(*l*)(1). *See* Conf. Rep. No. 1194, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 3996, 4010–11.

Although we are generally reluctant to place great weight upon legislative history, we think it appropriate to consult such materials where, as here, a statutory element is not merely ambiguous, but completely absent. Moreover, our prior cases in this area have looked to legislative history. *Compare Nguyen*, 916 F.2d at 1019 (intent to impose strict liability "explicit[ ]" in legislative history) *with Wallington*, 889 F.2d at 578 (legislative history fails to provide "any hint" that strict liability was intended).

19. It is not unknown for terrorists to plant weapons in the luggage of passengers who are less likely to arouse the suspicion of airport security than they are.

20. In affirming the magistrate's decision, the district court expressly "follow[ed] the reasoning" of the Eighth Circuit in *Flum.* The *Flum* court, in turn, had applied the test announced by then—Judge Blackmun in *Holdridge v. United States*, 282 F.2d 302 (8th Cir.1960):

"From these cases emerges the proposition that where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent." *Id.* at 310.

Although the *Holdridge* test has received the approval of at least some members of the Supreme Court, *see United States v. Freed*, 401 U.S. 601, 613 n. 4, 91 S.Ct. 1112, 1120 n. 4, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring in the judgment), and may well be an accurate statement of law, we have opted instead to follow the mode of analysis of our cases in this

## C.

■ Having declined to construe section 1472(*l*)(1) as a strict liability crime, it remains to be determined what level of mental culpability will support a conviction under it. We believe that the minimum level of *scienter*—the "should have known" standard—is appropriate and consistent with our case law.

■ The touchstone in our analysis is the severity of the punishment authorized by the statute. *See* 1 LaFave & Scott, *supra*, § 3.8, at 343 ("Other things being equal, the greater the possible punishment, the more likely some fault is required; and, conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.") (footnote omitted). A violation of section 1472(*l*)(1) is punishable by a fine of up to $10,000 and a prison sentence of up to one year. Therefore, a violation of section 1472(*l*)(1), although a non-petty offense,[21] is still a misdemeanor.[22]

area. Nevertheless, we do not believe that the *Holdridge* test would yield a result contrary to our decision.

21. Petty offenses are statutorily defined as those punishable by not more than six months in prison or a $5,000 fine. *See* 18 U.S.C. § 19. The petty/non-petty distinction is an important one in our law because a defendant charged with a non-petty offense has a right to a jury trial, whereas virtually no petty offenses require jury trials. *See Baldwin v. New York*, 399 U.S. 66, 68–73, 90 S.Ct. 1886, 1888–90, 26 L.Ed.2d 437 (1970); *Duncan v. Louisiana*, 391 U.S. 145, 159, 88 S.Ct. 1444, 1453, 20 L.Ed.2d 491 (1968); *Landry v. Hoepfner*, 840 F.2d 1201, 1205–10 (5th Cir.1988) (en banc), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989). There is some support for the notion that those crimes for which a jury trial is required are also the ones for which some degree of *mens rea* should be required. *See* Hopkins, *Mens Rea and the Right to Trial by Jury*, 76 Cal.L.Rev. 391, 397, 415–16 (1988) (arguing that the right to a jury trial includes the right to have a jury pass upon one's "moral blameworthiness" or *mens rea* ).

22. An offense that carries a punishment of one year or less, but more than six months, is statutorily defined as a Class A misdemeanor. *See* 18 U.S.C. § 3559(a)(6). Any offense for which a sentence of more than one year may be imposed is a felony.

23. We also note that in *United States v. Margraf, supra,* where the issue was whether section

We believe that a "should have known" standard is consistent with our prior cases in this area.[23] This case is most akin to *Delahoussaye,* in which we also applied a "should have known" standard. In *Delahoussaye,* as here, the crime at issue was a misdemeanor, although one punishable by a maximum of only six months in prison rather than one year. We decline today to go as far as *Anderson,* in which we required actual knowledge, because the crime at issue in that case was a felony that carried a possible sentence of ten years imprisonment. *See Nguyen,* 916 F.2d at 1016 (distinguishing *Anderson* on the ground that it involved a felony).[24]

The outcome of *Wallington* may appear somewhat anomalous when compared to *Delahoussaye, Anderson,* and our decision today. In *Wallington,* the statute at issue, 18 U.S.C. § 1905, prohibited government agents from disclosing confidential information acquired during the performance of their duties. As here, the crime was a Class A misdemeanor with a one year maxi-

1472(*l* ) requires a defendant to have knowledge of a weapon's dangerousness, the Third Circuit upheld the conviction on the ground that the defendant *"should have been aware* that [the knife] could be used as a deadly weapon and that others could have classified it as a deadly weapon." 483 F.2d at 712 (emphasis added); *id.* at 719 (Seitz, C.J., dissenting) ("the majority . . . upholds [defendant's] conviction on the ground *he should have been aware* other people could have considered or used his pocketknife as a deadly or dangerous weapon if carried aboard a plane.") (emphasis in original).

24. In *Nguyen,* where we eschewed a requirement of specific intent, the crime was punishable by six months in prison and a $25,000 fine, a lesser sentence (but a greater fine) than is available for violations of section 1472(*l*)(1). However, as previously noted, in *Nguyen* the Congress had clearly expressed its intent with respect to both *mens rea* and penalties. Moreover, the *Nguyen* court appeared to view the defendant's contention as being that knowledge of the law (that *caretta caretta* turtles were listed as endangered or it was illegal to transport them) was required. *Id.* at 1018, 1019. Nothing relating to knowledge of the law or of the legal significance of the weapon in the purse is involved here. Garrett fully knew what the gun was, but claims she simply did not know it was in her purse.

mum sentence. Nevertheless, we construed section 1905 as requiring knowledge on the part of its violators that the information was confidential. What distinguishes *Wallington,* we think, is that it was a First Amendment case. The defendant in *Wallington* had argued that the statute was impermissibly overbroad in that it would punish even innocent disclosures of information. We gave the statute a narrow construction to avoid a serious First Amendment question:

> "At least in a substantial number of cases, the requirement that government employees refrain from *knowingly* disclosing confidential information contained in government files or collected in the scope of their official duties will strike a permissible balance between the First Amendment and the practical necessities of public service." *Wallington,* 889 F.2d at 579 (emphasis added).

It seems apparent that the *Wallington* court believed a high level of *mens rea* was required for section 1905 in order to avoid serious questions of the law's validity under the First Amendment. The government may certainly penalize the deliberate disclosure of confidential information. *See, e.g., Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (upholding revocation of passport of former CIA employee who had pledged to reveal the identities of undercover CIA agents). Nevertheless, public employees do not surrender their free speech rights completely. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Thus, *Wallington* was concerned that a serious First Amendment problem might attend any attempt to attach criminal sanctions to a public employee who in good faith, albeit negligently, believed the information disclosed was not confidential. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court held that a public school teacher may not be dismissed for sending to a local newspaper a letter critical of the board of education "absent proof of false statements *knowingly or recklessly made by him.*" *Id.* at 574, 88 S.Ct. at 1738 (emphasis added); *id.* at 582, 88 S.Ct. at

1742 (White, J., dissenting in part) ("The Court holds that truthful statements by a school teacher critical of the school board are within the ambit of the First Amendment. So also are false statements *innocently or negligently made.*") (emphasis added). *See also Florida Star v. B.J.F.,* 491 U.S. 524, 538, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443 (1989) (reversing award of damages for publishing name of rape victim under state law imposing liability without regard to *scienter* or degree of fault); *see also id.* at 546, 109 S.Ct. at 2616 (White, J., dissenting); *United States v. Hicks,* 980 F.2d 963, 973–74 & nn. 15–16 (5th Cir.1992) (crime of intimidating flight crew members, by use of vulgar and profane language, requires knowing violation). In short, *Wallington* demanded a high level of *mens rea* in the context of a statute that raised serious First Amendment concerns. That is not the case here.

We conclude that one violates section 1472(*l*)(1) if, but only if, she either knew or should have known that the concealed weapon in question was on or about her person or property while aboard or attempting to board the aircraft.

### D.

■ There is ample evidence in the record to support the magistrate's conclusion that Garrett should have known that she was carrying the gun when she attempted to board by going through security. Garrett testified that she had traveled by air many times and that she was aware that it was illegal to try to bring a gun through airport security. And if she needed any reminder, there were two large signs in the area of the security checkpoint. The first sign, printed with large white letters upon a bright red background, stated: "CARRY NO WEAPONS OR EXPLOSIVES BEYOND THIS POINT: VIOLATORS ARE SUBJECT TO PROSECUTION UNDER FEDERAL CRIMINAL STATUTES REQUIRING PENALTIES AND/OR IMPRISONMENT." The sign also had an image of a pistol and a knife over which was superimposed a circle and a diagonal line. The other sign displayed a list of

"Federal Safety and Security Inspection Rules" and informed passengers, among other things, that, "Federal regulations prohibit persons from having a FIREARM, explosive or incendiary-device on or about their person or accessible property when entering or in an airport sterile area or while aboard an aircraft."

It is also relevant that the gun was in Garrett's hand bag. Garrett testified that she owns and uses seven or eight purses and that she did not remember when she put the gun in this particular bag, which was described at trial as a large leather satchel. She stated that she did not put the gun in the bag on the day of the flight, nor did she think that day to check the bag for it. On the other hand, she testified that she knew that she previously had carried the gun in that particular bag. Garrett also testified that she had put her wallet, checkbook, and makeup in the bag on the day in question. It is inferable that she would have used the bag during the day. We think it patently reasonable to require individuals in such circumstances to be aware of the presence of a firearm in their purse or equivalent bag, or, indeed, to infer that they actually have such knowledge.

In short, there is sufficient evidence in the record to support the magistrate's finding that Garrett should have known that she was carrying a firearm.[25]

**25.** We note one additional piece of evidence. The security guard who screened Garrett's bag testified that immediately after the bag was stopped on the conveyor belt, but before the guard had said anything, Garrett threw up her hands and announced that she was a state trooper's wife. Garrett similarly testified that "I don't know if it makes any difference; I used to be married to a state policeman." The guard also testified that, unlike most passengers discovered with guns, Garrett did not appear upset or nervous. The magistrate thought that Garrett's statement "indicat[ed] at least initially some justification that she could carry the gun." It is possible to read the magistrate as suggesting that Garrett may have known what she was doing but thought it was permissible. However, in the same transcribed paragraph, the magistrate also stated that "I need not decide whether [Garrett] had actual knowledge or not." In light

### E.

Garrett also makes the independent argument that the magistrate erred by failing to dismiss the bill of information because it did not allege that she carried the weapon "knowingly and intentionally."[26] Garrett raised this argument in a pre-trial motion to dismiss the information because of its failure to allege "that the defendant knowingly and intentionally committed the violation." The magistrate denied the motion nine days before trial, stating in his oral reasons that a "should have known" rather than an actual knowledge standard was applicable. Garrett renewed her motion just before trial began, again asserting that the information was defective for "not alleging a knowing and intentional commission of this crime." The magistrate again denied the motion, repeating his earlier ruling that actual knowledge was not required and that a "should have known" standard was applicable. In her appeal to the district court, Garrett again asserted that the information was deficient because it did not allege that she acted "knowingly and intentionally." Garrett cites *United States v. Pou*, 484 F.Supp. 972 (S.D.Fla.1979), in which the court concluded that actual knowledge is an element of a section 1472(*l*) violation and dismissed a bill of information that failed to allege such (*see also, supra*, note 14).

For the reasons previously stated, we agree with the magistrate that a "should have known," rather than an actual knowl-

of the latter statement, and in the absence of any express finding by the trial court on the credibility of Garrett's claim to have forgotten the gun, we view the magistrate as having found *only* that Garrett should have known the gun was there in her purse.

**26.** The bill of information alleged:

"On or about December 18, 1990, in the Eastern District of Louisiana, the defendant, REGINA KAY GARRETT, did, while attempting to board an aircraft intended for operation in air transportation, have about her person and property a concealed deadly and dangerous weapon, to wit: a Browning semi-automatic .25 caliber handgun, serial number 210582, which would have been accessible to her in flight; all in violation of Title 49, United States Code, Section 1472(*l*)(1)."

edge, standard is applicable. This answers the only argument as to the sufficiency of the information that Garrett has ever expressly raised, here or below. In these circumstances, we decline to reverse the conviction on the basis that the information did not expressly allege that Garrett should have known the gun was in her purse, although clearly the better practice would have been to include such an allegation.

■ The function of a bill of information is to fairly inform the accused of the charges against him and to allow him to plead an acquittal or conviction in bar of future prosecution for the same offense. An indictment or information is sufficient if it serves these purposes. *See Hamling v. United States*, 418 U.S. 87, 116, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *Russell v. United States*, 369 U.S. 749, 761–65, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962). Here, there is no suggestion that the information failed to serve these functions.

■ We also note that the language used in the information tracked the language of the statute, and usually this suffices.[27] *See United States v. Colon–Padilla*, 770 F.2d 1328, 1334 (5th Cir.1985). However, it is also true, as a general matter, that "[i]f the statute omits an essential element, such as mens rea, then that element must be added to the pleading." 2 W. LaFave & J. Israel, Criminal Procedure § 19.2, at 452 (1984). This rule may have less stringent application where the required mental element is not only not expressly contained in the statute but is also something less than actual knowledge or specific intent. For example, in *Tallman v. United States*, 465 F.2d 282 (7th Cir. 1972), the court concluded that for pur-

poses of 18 U.S.C. § 1464 the required state of mind was "knew or reasonably should have known," *id.* at 288, and that "in view of the content of the *scienter* requirement implied in the statute . . . the indictment need not allege that element." *Id.* at 286.

■ In any event, any error in this case was harmless because the magistrate applied the *mens rea* standard that we approve today. *See United States v. Fusaro*, 708 F.2d 17, 23 (1st Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) (where indictment failed to charge intent, but jury was instructed that intent is necessary, any error was harmless). *Fusaro*'s reasoning in this respect may be open to question in a felony indictment case, where it is important that the *grand jury* find probable cause as to all elements of the offense. Where the offense is prosecuted by information, however, the charging instrument may be amended.[28] Nine days before trial the magistrate rejected Garrett's challenge to the information for not alleging that she acted "knowingly and intentionally," ruling that such a state of mind was not required for conviction, and that a "should have known" standard would instead be applied. Garrett did not thereafter even alternatively attack the information for not alleging "should have known," but merely repeated, just before trial, her earlier challenge, which the magistrate again rejected on the basis that the correct standard was "should have known." Garrett, and the prosecution, clearly knew in advance the mental element the case would be tried on, and Garrett objected to that *only* because she contended a more culpable state of mind was re-

---

**27.** This fact distinguishes *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir.) (en banc), *cert. denied sub nom. Govantes v. United States*, 488 U.S. 842, 109 S.Ct. 113, 102 L.Ed.2d 87 (1988) ("It is well established that an indictment is defective if it fails to allege elements of scienter that are *expressly contained* in the statute that describes the offense.") (emphasis added).

**28.** *See United States v. Adams*, 778 F.2d 1117, 1122, 1125 (5th Cir.1985) (indictment, as act of grand jury, may not be amended); Advisory Committee Notes to Rule 7(e), Fed.R.Crim.P. ("unlike an indictment, an information may be

amended"); 2 W. LaFave & J. Israel, *Criminal Procedure* § 19.2(g) at 462 (West 1984) (permissible to amend information by "an amendment that perfects a defective information by adding an essential element of the crime," but not so as to "allege a new offense"); Wright, *Federal Practice and Procedure, Criminal 2d*, § 128 (". . . the restrictive rules about amendment of an indictment have no application to an information. Instead the information may be amended in either form of [*sic*] substance"; *id.* at 430, footnote omitted).

quired, not because the information did not allege the "should have known" standard. In these circumstances, the magistrate can be regarded as in substance having made, without objection of either party, any amendment required to incorporate "should have known" into the information.

Under all the circumstances, we conclude there is no plain error and that Garrett's substantial rights were not violated by the form of the information. *See* Fed. R.Crim.P. 52(a); *Cf. Delahoussaye,* 573 F.2d at 913.

III. Application of the Sentencing Guidelines

 Garrett's final argument is that in calculating her offense level the trial court failed to give her a downward adjustment pursuant to U.S.S.G. § 2K1.5(b)(3). That section provides: "If the defendant's possession of the weapon or material would have been lawful but for 49 U.S.C. § 1472(*l*) and he acted with mere negligence, decrease by 3 levels." Whatever the merits of her contention (and they are suspect), the magistrate stated in clear terms that he would have imposed the same sentence even if he thought that Garrett were entitled to the reduction. Because it would have been consistent with the guidelines and well within the magistrate's purview to do so, any error in applying section 2K1.5(b)(3) therefore was harmless. *See Williams v. United States,* ── U.S. ──, ── ── ──, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992).

**Conclusion**

For the reasons stated herein, Garrett's conviction and sentence are

AFFIRMED.