# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Sito, 2013 IL App (1st) 110707**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID LOUIS SITO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-0707 |
| Filed<br>Rehearing denied | July 16, 2013<br>August 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for unauthorized possession or storage of a weapon, the knife discovered in defendant's possession as he entered a court building was properly measured from the hilt to the tip of the blade, but the cause was remanded for a new trial due to the trial court's error in striking the word "knowingly" from the instruction on the elements of the offense based on the mistaken belief that the offense was an absolute liability offense, since "knowledge" is the proper mental state to be applied to a charge of unauthorized possession or storage of a weapon. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-MC-1224576; the Hon. Clarence Burch, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Geoffrey Burkhart, all of
State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and
Matthew Connors, Assistant State's Attorneys, of counsel), for the
People.

Panel

JUSTICE QUINN delivered the judgment of the court, with opinion.

Justices Connors and Simon concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant David Louis Sito was found guilty of unauthorized
possession or storage of weapons, then sentenced to 364 days' imprisonment. On appeal,
defendant contends that his conviction should be reversed where the State's witnesses
erroneously included a "non-cutting" part of a knife in their measurements of its blade, and
the trial court erroneously struck the word "knowingly" from jury instructions. For the
following reasons, we reverse and remand.

¶ 2    On March 12, 2009, defendant set off a metal detector in the lobby of the Richard J.
Daley Center, 50 West Washington Street, in Chicago, and a Cook County deputy sheriff
discovered a knife in his pocket. He was subsequently charged with unauthorized possession
or storage of weapons and elected to be tried by a jury.

¶ 3    Defendant represented himself at trial. Orestes Ruffin, the vice president of MB Real
Estate Services of Illinois, LLC (MB Real Estate), and the general manager of the Daley
Center, testified that MB Real Estate operates the Daley Center pursuant to a contract with
the Public Building Commission of Chicago, which owns the building. MB Real Estate
receives money to operate the Daley Center from the Public Building Commission, which,
in turn, receives its money from the City of Chicago and the County of Cook.

¶ 4    Cook County Deputy Sheriff Ronnie Sprowls testified that on March 12, 2009, he was
working in the lobby of the Daley Center when defendant walked through and set off the
metal detector. He asked defendant to step over and began to wand him, and as he was doing
so, he felt something in defendant's right pocket which he believed to be a knife. Deputy
Sprowls then reached into defendant's pocket and pulled out a knife. When he asked
defendant where he was going, defendant told him that he was going to see Deputy Sheriff
Edward Bionci "in regards to someone sodomizing his cats." Deputy Sprowls found that
comment to be "strange and unusual" and asked defendant to step aside as he placed a call
to Deputy Bionci. Then, after speaking with Deputy Bionci, he took defendant downstairs
to the lockup for further investigation. Deputy Sprowls testified that he measured the knife
recovered from defendant with a ruler and that it measured 3⅛ inches long from the hilt to

the tip of the knife. On cross-examination, Deputy Sprowls acknowledged that the "flat edge part of the knife," *i.e.*, the sharpened edge, ended at some point before the handle.

¶ 5    Sergeant Lawrence Garrett of the Cook County sheriff's department testified that on the day in question, he was the sergeant in charge of security for the Daley Center, and that prior to that date, he had neither met nor heard of defendant, and never received a written request from him to bring a knife into the building. He also testified that there were no written orders from a judge allowing defendant to bring a knife into the building. On cross-examination, Sergeant Garrett stated that he measured the knife recovered from defendant with a ruler as well and that it measured 3⅛ inches from the handle to the tip of the knife.

¶ 6    The State rested its case-in-chief and defendant called Cook County Deputy Sheriff Eric Beverly, who was working security in the lobby at the Daley Center on the day in question. Deputy Beverly testified that he does not remember defendant emptying his pockets or putting his bag on the "conveyor belt."

¶ 7    Defendant also called Cook County Deputy Sheriff Michelle Fourte-Johnson, who was working the X-ray machine on the day in question. Deputy Fourte-Johnson did not recall defendant emptying his pockets that morning, or placing his bags on the X-ray machine, but does recall that his bag was stopped. She testified that she X-rayed the bag once or twice, had her partner check it for prohibited objects, and found a glass bottle inside.

¶ 8    Defendant then testified in the narrative that on March 12, 2009, he went to the Daley Center to meet with Deputy Bionci, whom he had been in contact with since December 2008, regarding animal cruelty at his boyhood home in Wilmette. He testified that when he arrived, he emptied his pockets and placed his items on the tray, put his bags on the X-ray machine, then walked through the metal detector, which was set off by his "belt or something." Deputy Sprowls wanded him and "that was it." However, Deputies Fourte-Johnson and Beverly wanted to run his bags through the X-ray machine again. After a couple times running his backpack through, Deputy Fourte-Johnson found a glass bottle, which the deputies told him he could not bring into the building. They then ran his backpack through four or five more times and found the knife in question. Defendant testified that he was not aware that the knife was in his backpack, and that he told Deputy Sprowls, "I'm on bond. I'm not looking for any trouble, is there a problem with this?" Deputy Sprowls responded that he thought that defendant was on parole, but defendant corrected him, "no, not parole, pretrial bail bond release."

¶ 9    Defendant was taken downstairs to the lockup, and while down there, he asked Deputy Sprowls if he was under arrest, to which Deputy Sprowls responded, "No, you're being held for an investigation." The deputies then went through his bag, made copies of various materials, and counted out his money, which amounted to $1,340. At some point, Deputy Sprowls asked defendant, "Do you have any money to get home?" and defendant responded, "You know I got money, I've got $1300. You counted it twice." Deputy Sprowls then told him, "You'll be going home in 10 minutes," but 20 minutes later, a Sergeant Henley arrived and asked defendant if he "had seen the *Miranda* rights." Defendant testified that he placed his initials next to each right, but did not sign the bottom of the page to indicate that he had waived those rights. He also testified that when he complained to the sergeant that he had not

been allowed to use the phone, the sergeant "got all huffy and puffy, started threatening [him] with disorderly conduct charges." Defendant ultimately answered a few of his questions, but "chose to exercise the Fifth Amendment" with respect to some others, which "inflamed him even more." Then, later that evening, he was driven to the lockup in Maywood and learned on the way there that he had been charged with unauthorized possession or storage of weapons. Defendant presented the jury with photographs of the knife in question next to three different rulers and testified that the pictures showed the blade to be $2\frac{7}{8}$ inches long.

¶ 10    During the jury instructions conference, the State proposed a non-Illinois Pattern Jury Instruction (IPI) for the definition of unauthorized possession or storage of weapons. The State argued that in 1997, the legislature amended the language of the statute to include the words "public funds" and "building," but that the IPI instruction still reflected the previous language. The State also argued that the IPI instruction included the phrase "knowingly," but that the statute, itself, did not contain that term. The court stated that it was going to "follow the statute in every detail," and over defendant's objection, gave the State's proposed instructions. It instructed the jury as follows:

> "A person commits the offense of unauthorized possession or storage of weapons when he possesses any knife with a blade of at least three inches in length in any building supported in whole or in part with public funds without prior written permission from the chief security officer for the building.
>
> To sustain the charge of unauthorized possession or storage of weapons, the State must prove the following propositions: First proposition, that the Defendant possessed any knife with a blade of at least three inches in length; and the second proposition, that the Defendant did so in a building supported in whole or in part with public funds without prior written permission from the chief security officer for such building."

After the jury was so instructed, it returned a verdict finding defendant guilty of unauthorized possession or storage of weapons. Defendant was then sentenced to 364 days' imprisonment and appealed pursuant to Illinois Supreme Court Rules 603 and 606 (eff. Feb. 6, 2013).

¶ 11    In this appeal, we are first asked to determine what part of a knife constitutes the "blade" for purposes of the unauthorized possession or storage of weapons statute. Under the Criminal Code of 1961 (Code), a person commits unauthorized possession or storage of weapons when he "possesses or stores any weapon enumerated in Section 33A-1 in any building *** supported in whole or in part with public funds *** without prior written permission from the chief security officer for such *** building." 720 ILCS 5/21-6(a) (West 2008). Section 33A-1 includes any "knife with a blade of at least 3 inches in length." 720 ILCS 5/33A-1(c)(2) (West 2008).

¶ 12    Defendant contends that his conviction should be reversed because the State's witnesses included a "non-cutting" part of the knife in question in their measurements of the blade. He claims that dictionaries, legislative history, case law, and commonsense show that a "blade" is "the flat, cutting edge of a knife" and does not include the "non-cutting portion."

¶ 13    The State responds that no Illinois court has ever adopted defendant's definition of "blade," and that a commonsense interpretation of that term includes the length of the knife measured by law enforcement officers in this case. The State also responds that the jury

found the length of the blade to be longer than three inches and that defendant's attempt to revisit the fact finder's conclusion is inappropriate.

¶ 14    Initially, the parties dispute the standard of review to be applied. Defendant maintains that statutory construction of the term "blade" presents a legal question subject to *de novo* review, and the State asserts that defendant's claim is implicitly a sufficiency challenge because his "argument represents dissatisfaction with the jury's conclusion that the blade of the knife was longer than 3 inches." In reply, defendant argues that even if he had framed his question as a reasonable doubt issue, review in this court is still *de novo* where reasonable doubt turns on statutory construction.

¶ 15    We agree with the State that defendant's argument is in the nature of a challenge to the sufficiency of the evidence in that he is arguing that the blade of the knife in question was not long enough to sustain his conviction of unauthorized possession or storage of weapons. That said, resolution of this issue turns solely on the meaning of the term "blade," as used in section 33A-1 of the Code. This is purely an issue of statutory construction, and thus our review is *de novo*. *People v. Comage*, 241 Ill. 2d 139, 143-44 (2011).

¶ 16    In determining the meaning of the term "blade," we observe that "[t]he cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent." *Comage*, 241 Ill. 2d at 144. That intent is best indicated by giving the statutory language its plain and ordinary meaning. *Comage*, 241 Ill. 2d at 144. "To determine the plain meaning, we must consider the statute in its entirety and be mindful of the subject it addresses." *Comage*, 241 Ill. 2d at 144.

¶ 17    Here, the term "blade" is not defined by the Code, and thus it is appropriate to employ a dictionary definition to ascertain its meaning. *Comage*, 241 Ill. 2d at 144. We begin with the definition of "knife," as it is that weapon, not merely a blade, which was at issue in this case. Webster's dictionary defines "knife" as "a cutting instrument consisting of a sharp blade fastened to a handle." Merriam-Webster's Collegiate Dictionary 690 (11th ed. 2005); see also The American Heritage Dictionary 704 (2d coll. ed. 1982) (defining "knife" as a "[a] cutting instrument consisting of a sharp blade with a handle"). "Blade" is defined as either "the cutting part of an implement" (Merriam-Webster's Collegiate Dictionary 129-30 (11th ed. 2005)), or "[t]he flat-edged cutting part of a sharpened tool or weapon" (The American Heritage Dictionary 185 (2d coll. ed. 1982)).

¶ 18    Defendant maintains that these definitions of "knife" and "blade" indicate that "any part of a knife incapable of cutting or being sharpened is not a blade." We disagree. The above dictionary definitions make clear that a knife is comprised of two components: a handle and a blade; thus, that part of the knife which is not the handle is the blade. Although defendant attempts to draw a distinction between the "non-cutting" portion of a knife and its "cutting edge," he is more accurately distinguishing the sharpened edge of a blade from its nonsharpened edge. The above definitions support a distinction between the "cutting part" of a knife and its noncutting part, *i.e.*, the blade and the handle; however, they support no such distinction between the sharpened edge of a blade and its nonsharpened edge.

¶ 19    Defendant relies on two out-of-state cases to support his claim that the term "blade" means only the sharpened portion of a knife, *In re Rosalio S.*, 41 Cal. Rptr. 2d 534 (Cal. Ct.

App. 1995), and *Bradvica v. State*, 760 P.2d 139 (Nev. 1988) (*per curiam*). In *Rosalio S.*, 41 Cal. Rptr. 2d at 535, the California Court of Appeal was asked to interpret the word "blade" as used in a statute which outlawed "possession on a school campus of a 'knife having a blade longer than 2½ inches.' [Citation.]" Citing definitions of "blade" that referred to the "cutting part," the court initially noted that "[i]f one were to rely on the dictionary definition of 'blade' for the common, ordinary meaning of the word, then it would appear that the blade of [defendant's] knife consisted solely of the sharpened part since that is the only portion that is used to cut objects." *Rosalio S.*, 41 Cal. Rptr. 2d at 536. The State argued, however, that "since 'knife' is commonly defined as a tool consisting of a blade and a handle [citation], 'blade' *** is not restricted to the sharpened portion but rather 'anything that is not handle is blade.' " *Rosalio S.*, 41 Cal. Rptr. 2d at 536. The State further argued that a "blade" was comprised of both the unsharpened metal part and the sharpened metal part because "all of the metal portion of a knife would penetrate a victim if the knife were used as a stabbing weapon." *Rosalio S.*, 41 Cal. Rptr. 2d at 537. After reviewing the statutory scheme, the court ultimately disagreed with the State's interpretation of the term "blade." The court found that in light of the ban on "stabbing knife-like weapons" elsewhere in the statute, namely, dirks and daggers, which were defined by the legislature as " 'a knife or other instrument *** primarily designed, constructed, or altered to be a stabbing instrument,' " and the rule that it should avoid a construction that makes any language surplusage, the legislature's use of the term "blade" referred to its cutting function rather than its stabbing function. *Rosalio S.*, 41 Cal. Rptr. 2d at 537. The court noted that this conclusion was in keeping with the ordinary meaning of the term "blade," and the rule of statutory construction that when interpreting a criminal statute, terms should be strictly construed. *Rosalio S.*, 41 Cal. Rptr. 2d at 537. The court thus held that "in determining whether a knife has 'a blade longer than 2 ½ inches,' *** only the sharpened portion should be measured." *Rosalio S.*, 41 Cal. Rptr. 2d at 538.

¶ 20   In *Bradvica*, 760 P.2d at 141, the Supreme Court of Nevada was similarly asked to interpret the word "blade" as used in a Nevada statute that defined "switchblade" as a "knife with a spring-blade or snap-blade two or more inches long that is released automatically by a release mechanism." There, the defendant was convicted of possession of a knife that measured 2 5/16 inches from tip to handle and less than 2 inches along the sharpened edge. *Bradvica*, 760 P.2d at 140. He admitted that the knife released the blade by the press of a button, but claimed that the term "blade" had to be strictly construed since it was not defined by the statute. *Bradvica*, 760 P.2d at 141. The Supreme Court of Nevada agreed. Noting that the dictionary defines "blade" as " 'the cutting part of an instrument,' " the court held that "the 'blade' of such a knife is that portion which is customarily sharpened from the tip of the knife to the tang, or the unsharpened extension of the blade which forms the hinge connecting the blade to the handle." *Bradvica*, 760 P.2d at 141. Applying that holding, the court reversed defendant's conviction because the blade of his knife measured under two inches. *Bradvica*, 760 P.2d at 141.

¶ 21   "Although it is helpful to look to other jurisdictions for guidance, we are not bound by those decisions and must decide the case in a manner consistent with Illinois law." *Independent Trust Corp. v. Kansas Bankers Surety Co.*, 2011 IL App (1st) 093294, ¶ 24. Having reviewed *Rosalio S.* and *Bradvica*, we do not find those courts' definitions of the

-6-

term "blade" persuasive. Neither court gave the term its plain and ordinary meaning. A "knife" is "a cutting instrument consisting of a sharp blade fastened to a handle," and the "blade" is "the cutting part" of the knife. It is that simple. Reading the definition of the term "blade" as covering only the sharpened edge of the blade, as done by the courts in *Rosalio S.* and *Bradvica*, and urged by defendant here, merely introduces nuance where none is warranted. It is not our task to introduce nuance, but to give terms their plain and ordinary meaning. *Comage*, 241 Ill. 2d at 144.

¶ 22    Defendant's proposed definition of the term "blade" is also inconsistent with section 33A-1, which, while specifically banning knives with three-inch blades, also bans any "dagger, dirk, switchblade knife, stiletto, axe, hatchet, or other deadly or dangerous weapon or instrument of like character." 720 ILCS 5/33A-1(c)(2) (West 2008). The fact that the legislature prohibited weapons posing a threat of both cutting *and* stabbing shows that the legislature was not merely concerned with the sharpened edge of a knife, but with the entire portion of a knife that could penetrate a body after an initial incision was created by the sharpened edge.

¶ 23    We find it further significant that our case law has recognized that "[a] knife with a blade that is not at least three inches long can be a deadly weapon under section 33A-1 of the Criminal Code." *In re T.G.*, 285 Ill. App. 3d 838, 845 (1996); see also *People v. Charles*, 217 Ill. App. 3d 509, 512 (1991) (noting that "[a] knife with a blade less than three inches in length could be dangerous if it is used in such a manner"); *People v. Samier*, 129 Ill. App. 3d 966, 969 (1985) (finding that a knife with a blade less than three inches in length was a deadly weapon since it could have been deadly if used in the manner threatened). If a knife can qualify as a deadly weapon under section 33A-1 even when its blade is less than three inches, we find it highly unlikely that the legislature intended "blade" to be defined so narrowly as to include only the area that has been sharpened. We therefore hold, in accordance with the common definitions of "knife" and "blade," that the blade of a knife is properly measured from the hilt to the tip of the blade. That is how the State measured the blade of defendant's knife in this case, and, thus, defendant was proved guilty beyond a reasonable doubt of unauthorized possession of a knife with a blade of at least three inches in length.

¶ 24    Defendant next contends that the trial court abused its discretion in striking the term "knowingly" from Illinois Pattern Jury Instructions, Criminal, Nos. 16.17 and 16.18 (4th ed. 2000) (hereinafter IPI Criminal 4th Nos. 16.17 and 16.18). He claims that the court struck the term in the mistaken belief that unauthorized possession or storage of weapons is an absolute liability offense, and that striking the term was a violation of Illinois Supreme Court Rule 451(a) (eff. July 1, 2006).

¶ 25    The State responds that the trial court properly instructed the jury as to the elements of the offense where the IPI instructions in question did not accurately state the law. The State notes that the unauthorized possession or storage of weapons statute does not have a component mental state and that the legislature has an interest in protecting public places of accommodation from individuals armed with dangerous weapons.

¶ 26    Under the supreme court rules, the trial court must instruct the jury with an IPI Criminal

instruction unless the court determines that it does not accurately state the law. Ill. S. Ct. R. 451(a); *People v. Hudson*, 222 Ill. 2d 392, 399-400 (2006). We will not disturb the trial court's decision to instruct a jury with a non-IPI instruction absent an abuse of discretion. *Hudson*, 222 Ill. 2d at 400.

¶ 27　　　IPI Criminal 4th No. 16.17 states:

"A person commits the offense of unauthorized possession or storage of weapons when he knowingly [(possesses) (stores)] any [*** (knife with a blade of at least three inches in length) ***] [(on land) (in a building on land)] supported in whole or in part with [(State funds) (Federal funds administered through State agencies)] without prior written permission from the chief security officer for the [(land) (building)]."

IPI Criminal 4th No. 16.18 similarly states:

"To sustain the charge of unauthorized possession or storage of weapons, the State must prove the following propositions:

*First Proposition:* That the defendant knowingly [(possessed) (stored)] any [*** (knife with a blade of at least three inches in length) ***]; and

*Second Proposition:* That the defendant did so [(on land) (in a building on land)] supported in whole or in part with [(State funds) (Federal funds administered through State agencies)] without prior written permission from the chief security officer for such [(land) (building)]."

Here, the trial court struck the word "knowingly" from the above instructions and thereby eliminated a culpable mental state for the offense of unauthorized possession or storage of weapons. The first issue for our determination, therefore, is whether unauthorized possession or storage of weapons is an absolute liability offense. This is an issue of statutory interpretation, which we review *de novo*. *People v. Molnar*, 222 Ill. 2d 495, 519 (2006).

¶ 28　　　As noted above, our primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *Molnar*, 222 Ill. 2d at 518. We begin with the language of the statute given its plain and ordinary meaning. *Molnar*, 222 Ill. 2d at 518. Where the language is clear and unambiguous, we will apply the statute without resorting to additional aids of statutory construction. *Molnar*, 222 Ill. 2d at 518-19. "All the provisions of an enactment should be viewed as a whole." *Molnar*, 222 Ill. 2d at 519. "Words and phrases should not be construed in isolation, but must be interpreted in light of other relevant statutory provisions." *Molnar*, 222 Ill. 2d at 519.

¶ 29　　　In the case at bar, it is undisputed that the unauthorized possession or storage of weapons statute does not expressly set forth a culpable mental state. However, "the mere absence of language expressly describing a mental state does not *per se* lead to the conclusion that none is required." *Molnar*, 222 Ill. 2d at 519. Rather, section 4-9 of the Code establishes the criteria for determining whether an offense is subject to absolute liability. That section states:

"A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for

the conduct described." 720 ILCS 5/4-9 (West 2008).

The committee comments to section 4-9 reveal that the legislature intended to limit the scope of absolute liability; thus, absent a clear indication that the legislature intended to impose absolute liability, or an important public policy favoring it, our supreme court has been unwilling to interpret a statute as creating an absolute liability offense. *Molnar*, 222 Ill. 2d at 519.

¶ 30    Here, unauthorized possession or storage of weapons is a Class A misdemeanor punishable by incarceration. 720 ILCS 5/21-6(a) (West 2008); 730 ILCS 5/5-8-3(a)(1) (West 2008). Thus, under section 4-9 of the Code, absolute liability may only be imposed for that offense if we find a clear indication of a legislative purpose to impose absolute liability. 720 ILCS 5/4-9 (West 2008). The State maintains that such a clear indication is present here given the plain language and purpose of the unauthorized possession or storage of weapons statute. However, we find that the legislative history of the statute does not support the State's contention.

¶ 31    The offense of unauthorized possession or storage of weapons was added to the Code by Public Act 76-1581, along with the offenses of criminal damage to state-supported property and criminal trespass to state-supported land. The legislature's purpose for adding these offenses was expressed in a declaration of intent, which states:

"The General Assembly finds and declares that the unlawful disruption of academic communities and the wilful and malicious destruction of academic property are grave offenses against the people of this State and have contributed substantially to a lack of confidence among the citizens of this State in the ability of our academic communities to provide an atmosphere in which serious study and research may proceed in a calm and orderly way; that the phenomenon of wide spread campus disorders and resulting destruction of university property cannot be tolerated in a State whose commitment to education for all its citizens is among the first priorities of government; therefore the General Assembly finds and declares that the severe penalties enumerated in this Act for certain kinds of crime are necessary." Pub. Act 76-1581 (eff. Sept. 26, 1969) (adding 720 ILCS 5/21-4, 21-5, 21-6).

Since 1969, when the offense of unauthorized possession or storage of weapons was enacted, there has not been a single case holding that unauthorized possession or storage of weapons is an absolute liability offense. The Illinois Pattern Jury Instructions have also specifically required a culpable mental state of "knowingly." The reason for treating the offense as subject to a culpable mental state is quite clear: nowhere in the enactment did the legislature expressly indicate an intent to impose absolute liability.

¶ 32    The State nonetheless attempts to infer a legislative intent to impose absolute liability based on the idea that it is necessary "in order to keep *** public places, like schools, free from armed people and the threat of violence." This conclusion, the State argues, "provides the most proactive manner to stop armed people from being a threat in public places." The State's argument is untenable, however, because the legislature's declaration of intent made no reference to keeping public buildings free from the "threat" of armed people. Moreover, even if it had, the State has not explained why keeping public buildings free from such a

threat would necessarily indicate that the legislature intended to impose absolute liability. We therefore find no basis for concluding that unauthorized possession or storage of weapons is an absolute liability offense.

¶ 33　　We note that courts in other jurisdictions with comparable statutes have reached a similar conclusion. For instance, in *State v. Ndikum*, 815 N.W.2d 816, 817-18 (Minn. 2012), the defendant was found guilty of gross misdemeanor possession of a pistol in public after he carried a briefcase containing a gun into a courthouse. The statute defining the offense provided:

> " 'A person, other than a peace officer, *** who carries, holds, or possesses a pistol in a motor vehicle, snowmobile, or boat, or on or about the person's clothes or the person, or otherwise in possession or control in a public place *** without first having obtained a permit to carry the pistol is guilty of a gross misdemeanor.' " *Ndikum*, 815 N.W.2d at 818 (quoting Minn. Stat. § 624.714 (2010)).

At trial, defendant had requested that the court give a jury instruction that knowledge was an element of the offense, but the court only instructed the jury that defendant must have " 'carried, held, or possessed a pistol.' " *Ndikum*, 815 N.W.2d at 817-18. On appeal, the Supreme Court of Minnesota concluded that the trial court abused its discretion in failing to instruct the jury that "the State was required to prove that [defendant] knew he possessed the pistol." *Ndikum*, 815 N.W.2d at 822. In reaching that conclusion, the court examined the statutory language to determine whether the legislature had intended to create a strict liability offense and found that the statute was not a public welfare statute and, therefore, a *mens rea* element was not dispensed with by the legislature. *Ndikum*, 815 N.W.2d at 820-22. The court also noted that subsequent violations of the statute were felony offenses and that "felony-level punishment is incompatible with the theory of a public welfare offense." *Ndikum*, 815 N.W.2d at 822.

¶ 34　　Similarly, in *United States v. Garrett*, 984 F.2d 1402, 1404 n.2 (5th Cir. 1993) (quoting 49 U.S.C. app. § 1472(l) (1988)), the defendant was found guilty of attempting to board an aircraft with a concealed weapon in violation of a federal statute that provided:

> " '(1) With respect to any aircraft in, or intended for operation in air transportation or intrastate air transportation, whoever–(A) while aboard, or while attempting to board such aircraft has on or about his person or his property a concealed deadly or dangerous weapon which is, or could be, accessible to such person in flight; ... shall be fined not more than $10,000 or imprisoned not more than one year, or both.' "

Defendant argued on appeal that the government did not prove that she had knowledge that a gun was in her purse, and the government, in turn, argued that the offense was subject to strict liability. *Garrett*, 984 F.2d at 1406. The Fifth Circuit Court of Appeals found that "the text of [the statute] provide[d] no indication that the Congress intended to depart from the default rule of requiring some *mens rea*," and that there was nothing "in the legislative history of the Federal Aviation Act that would lead [it] to believe that the Congress intended [the statute] to be a wholly strict liability offense." *Garrett*, 984 F.2d at 1411. The court also found that "a serious due process problem would be raised by application of th[e] statute, which carries fairly substantial penalties, to someone who did not know and had no reason

to know that he was carrying a weapon." *Garrett*, 984 F.2d at 1411. The court therefore concluded that Congress did not intend the statute "to reach persons acting without any *mens rea* whatsoever," and that a " 'should have known' " standard was appropriate. *Garrett*, 984 F.2d at 1411-12.

¶ 35    Like the statutes at issue in *Ndikum* and *Garrett*, the unauthorized possession or storage of weapons statute contains no clear indication of a legislative purpose to impose absolute liability. Also, the potential punishment for a conviction is "fairly substantial" at less than one year of imprisonment (720 ILCS 5/21-6(a) (West 2008); 730 ILCS 5/5-8-3(a)(1) (West 2008)), making it unlikely that the legislature intended to impose absolute liability for that offense. See *People v. Gean*, 143 Ill. 2d 281, 287 (1991) (noting that " 'where the punishment is great, it is less likely that the legislature intended to create an absolute liability offense' ") (quoting *People v. Sevilla*, 132 Ill. 2d 113, 122 (1989)). Given these circumstances, we must conclude that unauthorized possession or storage of weapons is not an absolute liability offense.

¶ 36    Having so concluded, we must therefore determine the appropriate mental state in a prosecution for unauthorized possession or storage of weapons. To that end, we look to our supreme court's decision in *People v. Farmer*, 165 Ill. 2d 194 (1995) which is nearly on point. There, four defendants were charged in unrelated prosecutions with possessing contraband in a penal institution: three with possessing drugs and one with possessing a knife. *Farmer*, 165 Ill. 2d at 197-98. The issue before the supreme court was whether possessing contraband in a penal institution was an absolute liability offense. *Farmer*, 165 Ill. 2d at 202. The supreme court held that it was not and determined that "knowledge" was the proper mental state for the offense, stating:

> "Possession offenses typically require proof of knowing possession. Two general provisions of the Code deserve mention in this regard. First, section 4-1 of the Code specifies that '[a] material element of every offense is a voluntary act.' (720 ILCS 5/4-1 (West 1992).) In turn, section 4-2 provides that '[p]ossession is a voluntary act if the offender *knowingly* procured or received the thing possessed, or was aware of his control thereof for a sufficient time to have been able to terminate his possession.' *** (720 ILCS 5/4-2 (West 1992).) In accordance with these principles, we conclude that knowledge is the appropriate mental state element in prosecutions under section 31A-1.1(b)." (Emphasis in original.) *Farmer*, 165 Ill. 2d at 206-07.

Here, unauthorized possession or storage of weapons is a possession offense like the statute at issue in *Farmer*. Thus, as in that case, we believe that "knowledge" is the proper mental state to be applied. *Farmer*, 165 Ill. 2d at 206-07. This is the mental state contained in IPI Criminal 4th Nos. 16.17 and 16.18, and we find that the trial court abused its discretion in striking it from the instructions given to the jury. *Hudson*, 222 Ill. 2d at 399-400.

¶ 37    This leaves us with the remaining issue of the effect of the trial court's error. Defendant maintains that the trial court's error was reversible where he repeatedly argued that the State could not prove that he possessed the requisite mental state. The State, on the other hand, argues that any error was harmless because defendant cannot establish that the result of the trial would have been different had the jury been properly instructed.

¶ 38    "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003). Because the jury in this case was erroneously instructed as to the mental state required to convict defendant of unauthorized possession or storage of weapons, we must determine whether the evidence of his guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt. *Pomykala*, 203 Ill. 2d at 210.

¶ 39    Here, the jury could have certainly inferred from the State's evidence that defendant knowingly possessed the knife in question. However, the jury was essentially instructed not to consider defendant's testimony to the contrary, *i.e.*, that he was unaware that he had the knife, where it was erroneously instructed that he was guilty of unauthorized possession or storage of weapons if he simply "possesse[d] any knife with a blade of at least three inches in length." Under the circumstances, we cannot say that the evidence of defendant's guilt was so clear and convincing as to render the erroneous jury instruction harmless beyond a reasonable doubt. *Pomykala*, 203 Ill. 2d at 210-11. We therefore reverse and remand this cause for a new trial.

¶ 40    Reversed and remanded.